**UNITED STATES of America, Appellee,**

v.

**Harry Nelson CORBIN, Jr., Appellant.**

**UNITED STATES of America, Appellee,**

v.

**Janice Lee RUGGIERO, Appellant.**

**Nos. 80–5130, 80–5136.**

United States Court of Appeals, Fourth Circuit.

Argued June 5, 1981.

Decided Oct. 26, 1981.

---

Paul F. Kemp, Asst. Federal Public Defender, Baltimore, Md. (Fred Warren Bennett, Baltimore, Md., on brief), for appellant in 80–5130.

Howard L. Cardin, Baltimore, Md. (Cardin & Gitomer, Baltimore, Md., on brief), for appellant in 80–5136.

Steven A. Allen, Asst. U. S. Atty., Baltimore, Md. (Russell T. Baker, Jr., U. S. Atty., Baltimore, Md., on brief), for appellee.

Before PHILLIPS and MURNAGHAN, Circuit Judges, and WILLIAMS *, District Judge.

MURNAGHAN, Circuit Judge:

Harry Nelson Corbin and Janice Lee Ruggiero appeal their convictions for possession of a controlled substance with intent to distribute (21 U.S.C. § 841(a)(1)), and interstate travel with intent to promote a business enterprise involving narcotics or controlled substances (18 U.S.C. § 1952). We affirm the convictions with regard to possession with intent to distribute, but re-

---

* The Honorable Richard L. Williams, United States District Judge for the Eastern District of Virginia, sitting by designation.

verse the convictions based on the Travel Act.

## I.

On February 6, 1980, two agents of the Drug Enforcement Administration (DEA) and a Maryland State Police trooper were conducting routine surveillance to intercept potential drug traffickers at Baltimore-Washington International Airport. The agents were not looking for anyone in particular, but became suspicious as Corbin and Ruggiero departed a flight arriving from Fort Lauderdale, Florida. The agents maintained surveillance as Corbin and Ruggiero waited in the baggage claim area. Eventually the agents approached Corbin and Ruggiero and identified themselves. When Corbin and Ruggiero gave evasive answers to questions, the agents asked Corbin and Ruggiero to accompany them to an office located off the concourse for further investigation.

During the investigation, Corbin and Ruggiero were shown a brown vinyl suitcase that remained unclaimed from the Fort Lauderdale flight. Each denied ownership or possession of the suitcase. An airline employee, following an established airline procedure of entering unlabeled lost or unclaimed baggage to seek identification of the owner, searched a side pocket of the suitcase solely to determine ownership, and discovered papers bearing both Corbin's and Ruggiero's names.[1] The agents then sought a warrant to search the other sections of the suitcase, and released Corbin and Ruggiero. When the agents obtained the warrant the next day, they found in the suitcase 4,700 quaalude tablets in five glassine packages. Corbin's and Ruggiero's arrests and convictions followed.

## II.

Corbin and Ruggiero first argue that the district court should have suppressed the tablets at trial, because the agents did not have a reasonable suspicion of criminal activity that justified the initial stop and detention. The argument relies primarily on *Reid v. Georgia*, 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980). The Supreme Court held in *Reid* that a DEA agent could not have a reasonable suspicion of criminal activity, as a matter of law, simply because a passenger departing an airplane fit four characteristics of a "drug courier profile."[2] The passenger in *Reid* (1) had arrived from Fort Lauderdale, a principal place of drug traffic; (2) on an early morning flight, when law enforcement activity was diminished; (3) appeared to be trying to conceal the fact that he was travelling with a companion; and (4) had no luggage other than a shoulder bag. Noting that only the third characteristic related to the passenger's particular conduct, the Court said that the "other circumstances describe a very large category of presumably innocent travellers, who would be subject to virtually random seizures were the Court to conclude that as little foundation as there was in this case could justify a seizure." *Id.* at 441, 100 S.Ct. at 2754.

The agents here testified that their attention was drawn to Corbin and Ruggiero because they met several characteristics of a drug-courier profile. Corbin and Ruggiero arrived from Fort Lauderdale, each appeared nervous, neither had a tan. Corbin was dressed in shirt sleeves and tan slacks, Ruggiero wore a white shag fur coat.[3] Those facts alone, we may assume, would

---

1. To the extent of that very limited, not unexpected intrusion, there was no invasion of any expectable right of privacy. Not surprisingly the defendants make no such challenge.

2. The Court in *Reid* described the drug-courier profile as a "somewhat informal compilation of characteristics believed to be typical of persons unlawfully carrying narcotics." 448 U.S. at 440, 100 S.Ct. at 2753. The content of drug courier profiles apparently varies in different parts of the country. *See United States v.*

*Allen*, 644 F.2d 749, 750 n.1 (9th Cir. 1980). For a complete list of the characteristics in a profile, see *United States v. Berry*, 636 F.2d 1075, 1079 n.6 (5th Cir. 1981).

3. Although the agents testified, and the affidavit stated, that their attention was drawn to Corbin and Ruggiero because of their appearance, the record does not disclose why their clothing appeared suspicious.

be insufficient as a matter of law to support a reasonable suspicion of criminal activity. But before the agents approached Corbin and Ruggiero, the following events occurred.[4] Corbin and Ruggiero lingered at the boarding gate until the other passengers walked ahead, and scanned the area as if to determine whether they were under surveillance. They paid particular attention to one of the agents. Corbin and Ruggiero then walked toward the baggage claim area, with the agents maintaining surveillance. When Corbin and Ruggiero reached the bottom of an escalator, they stopped and scanned the area. They took special notice of one of the agents as the agent travelled down the escalator, walked past Corbin and Ruggiero and continued to the baggage claim area. When Corbin and Ruggiero reached the baggage claim area, they stood apart from the other passengers. They continued to scan the area, and again appeared to take special notice of the agents. At one point Corbin went to make a phone call. When one of the agents walked over to the telephones, Corbin hung up and returned to where Ruggiero was standing. Corbin later approached one of the agents and asked for change.

After the conveyor belt started, Ruggiero walked over and engaged two of the agents in conversation. She said she had seen them wandering around the airport and asked if they worked there. As the conversation continued, and after other passengers had retrieved their luggage, Corbin pulled a small suitcase off the conveyor belt, and returned to where he had been standing. When Ruggiero rejoined him, Corbin took an item from inside the suitcase, and gave it to Ruggiero. Ruggiero placed the item in a magazine, and walked toward the women's rest room. At this point two of the agents stopped Ruggiero, and the third stopped Corbin.[5]

The facts outlined establish a reasonable suspicion of criminal activity. *Reid* did not hold that agents could never rely on characteristics of a drug carrier profile, but simply that general characteristics that apply to a large number of persons cannot *alone* reasonably support a suspicion of criminal activity.[6] *Reid* implicitly reiterates the established rule that a suspicion of criminal activity must be grounded in the conduct of the particular suspects, *see United States v. Post*, 607 F.2d 847, 850 (9th Cir. 1979); *United States v. Chatman*, 573 F.2d 565, 567 (9th Cir. 1977), and must be based on "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion," *Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968).

To trained law enforcement agents,[7] "able to perceive and articulate meaning in given conduct which would be wholly innocent to the untrained observer," *Brown v. Texas*, 443 U.S. 47, 52 n.2, 99 S.Ct.

4. The facts are a summary of findings made by the district court based on the agents' testimony. Corbin and Ruggiero do not challenge the accuracy of the findings, but only the legal interpretation that can be placed on the findings.

5. Because the parties do not address the issue, we assume, without deciding, that Corbin and Ruggiero were "seized" when stopped by the agents. *See United States v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980).

6. Several decisions of the Fifth Circuit have interpreted *Reid* similarly. *See, e. g., United States v. Herbst*, 641 F.2d 1161, 1166 (5th Cir. 1981) (*Reid* "held that profile characteristics alone will not give rise to the requisite reasonable suspicion necessary to justify an investigatory stop"); *United States v. Goldstein*, 635 F.2d 356, 361 (5th Cir. 1981) (citing *Reid* for the

proposition that "an individual's manifestation of certain drug courier profile characteristics, without more, does not constitute reasonable suspicion"); *United States v. Hill*, 626 F.2d 429, 433 n.6 (5th Cir. 1980) (suggesting that reasonable suspicion does not exist where the "only facts used to justify a seizure involved characteristics matching the 'drug courier profile' ").

7. Undoubtedly the agents here were well-trained. One testified that before joining the DEA, he had conducted narcotics investigations for eight years as a member of a local police department, and had taught courses on narcotics enforcement at the University of Georgia. After joining the DEA, the agent received special training in narcotics enforcement.

2637, 2641 n.2, 61 L.Ed.2d 357 (1979), the conduct of Corbin and Ruggiero established a reasonable, particularized suspicion that they were transporting illegal drugs. From the time they departed the airplane, Corbin and Ruggiero appeared to be trying to determine whether they were under surveillance.[8] The agents reasonably could suspect that Corbin and Ruggiero engaged them in conversation precisely to determine whether they were in fact agents. Stopping Corbin and Ruggiero was a reasonable response to what appeared to be an attempt to destroy evidence; in fact, "[i]t would have been a failure of duty had the federal agents not detained [Corbin and Ruggiero] at that point in order to investigate further," *United States v. Berd*, 634 F.2d 979, 986 (5th Cir. 1981).[9] The intrusion at that point was minimal.[10] The agents did not draw their guns or make any other show of force. The agents identified themselves, and asked Corbin and Ruggiero questions.

The answers Corbin and Ruggiero gave to the agents' questions heightened the agents' suspicions. Corbin and Ruggiero told the agents their names, but could not produce identification, airline tickets, or baggage claim checks. They told the agents that they did not have their tickets, and did not know what they had done with them. Asked what names they were travelling under, Corbin said that they were travelling as Mr. and Mrs., but could not remember the names. After a second request for identification, Corbin produced his Social Security card, but could not recite the number from memory. The agents then asked Corbin and Ruggiero to accom-

pany them to a Maryland State Police office located at the airport. Corbin and Ruggiero agreed.

Corbin and Ruggiero suggest, although they do not argue explicitly, that the location and length of the ensuing detention make the detention unreasonable. The argument would have force were it not for the fact that Corbin and Ruggiero agreed to accompany the agents to the office, and consented to be searched.[11] Several courts have held that agents may request, without coercion, suspects stopped in public places to accompany them to an office or other place more convenient for an investigation. *See, e. g., United States v. Chatman*, 573 F.2d 565, 567 (9th Cir. 1977) (not improper for DEA agents to direct suspect stopped in airport to an interview room where interrogation could be conducted free from public view and attendant embarrassment); *United States v. Oates*, 560 F.2d 45, 57 (2d Cir. 1977) (agent could ask suspect stopped at departure lounge to step into an office located near boarding area).

In *Dunaway v. New York*, 442 U.S. 200, 216, 99 S.Ct. 2248, 2258, 60 L.Ed.2d 824 (1979), the Supreme Court held that custodial interrogation that approximates arrest must be based on probable cause or consent. Several courts interpreting *Dunaway* have emphasized that detentions not based on probable cause or consent must be brief. *See, e. g., Sharpe v. Savage*, 660 F.2d 967 (4th Cir. 1981); *United States v. Chamberlin*, 644 F.2d 1262, 1266 (9th Cir. 1981); *United States v. Wasserteil*, 641 F.2d 704, 707–08 (9th Cir. 1981); *United States v. Perez-Esparza*, 609 F.2d 1284, 1286–87 (9th Cir. 1979).

---

**8.** The district court, which heard the testimony and observed the witnesses, concluded that "the situation became one of mutual surveillance."

**9.** As the facts later developed, Ruggiero had not placed illicit material inside the magazine, but a driver's license. This, of course, does not affect the reasonableness of the agents' suspicion at the time.

**10.** The scope of an intrusion is one factor in determining its reasonableness. *See, e. g., United States v. Mendenhall*, 446 U.S. 544, 561, 562-63, 100 S.Ct. 1870, 1880, 1881 82, 64 L.Ed.2d 497 (1980) (Powell, J., concurring).

**11.** The district court found that "the only evidence in this case is that they did consent [to be searched]. There is no evidence that they did not consent." At oral argument, counsel

Although the detention of Corbin and Ruggiero cannot be characterized as brief,[12] they consented to it. In fact, the sequence of events from the moment the agents approached Corbin and Ruggiero parallels the events in *United States v. Mendenhall*, 446 U.S. 544, 557–560, 100 S.Ct. 1870, 1878–80, 64 L.Ed.2d 497 (1980), where a majority of the Court concluded that a suspect stopped in a Detroit airport consented to continued investigation.[13] *See also United States v. Wasserteil*, 641 F.2d 704, 708 n.4 (9th Cir. 1981).

### III.

Corbin and Ruggiero also challenge the district court's ruling that probable cause appeared on the face of the affidavit requesting the search warrant, and the alternative ruling that Ruggiero had abandoned a reasonable expectation of privacy in the suitcase by denying ownership or possession.[14] Each of these challenges is predicated on the unreasonableness of the initial stop and detention; Corbin and Ruggiero argue that the information developed subsequent to the stop cannot be considered in determining the existence of probable cause, and that Ruggiero's denial of ownership or possession cannot be considered in determining the issue of abandonment. Our holding that the initial stop and detention were reasonable makes it unnecessary to address these challenges.

### IV.

Corbin and Ruggiero argue that there was insufficient evidence to support a finding that they promoted a "business enterprise" in violation of the Travel Act, 18 U.S.C. § 1952. Subsection (a) of § 1952

essentially conceded that Ruggiero voluntarily consented to be searched.

12. After Corbin and Ruggiero entered the office, they were advised of their *Miranda* rights and told that they were suspected of transporting narcotics or other illegal drugs. The agents verified Corbin's and Ruggiero's identities through the Motor Vehicle Administration, and tried to determine whether any luggage remained unclaimed from the Ft. Lauderdale Flight. The agents questioned Corbin and Ruggiero separately about their inability to produce identification, tickets, or baggage claim checks, and their inability to tell agents the names they were travelling under. The agents obtained a dog trained in drug detection from a county police department; when let loose, the dog alerted to Ruggiero's coat. The agents also obtained a copy of the flight manifest, which indicated that no one named Corbin or Ruggiero boarded the flight. At about this time, Corbin and Ruggiero consented to a strip search and a search of their belongings. Inside Ruggiero's purse the agents found a hypodermic syringe, cotton balls and q-tips. The search also revealed a Florida driver's license issued to Corbin the day before, and papers indicating that Corbin had been arrested in Florida two weeks earlier for burglary and grand larceny and had been released on bond. The district court ruled that probable cause to arrest Ruggiero arose after the syringe was found in her purse. Approximately one hour and fifteen minutes had elapsed since Corbin and Ruggiero entered the office.

13. Corbin's and Ruggiero's consent was valid even though the trial court found that the agents would not have allowed them to leave.

The agent in *Mendenhall* also testified that he would not have allowed Mendenhall to leave. *See* 446 U.S. at 575, n.13, 100 S.Ct. at 1888, n.13 (White, J., dissenting). Corbin and Ruggiero accompanied the agents to the office voluntarily; no threats or shows of force were made. The agents twice told Ruggiero that she was not under arrest. It does not appear from the record, and Corbin and Ruggiero do not argue, that they attempted to leave or otherwise withdraw their consent. That they both consented to be searched supports a conclusion that they continued to cooperate voluntarily throughout the detention.

14. The court's ruling on abandonment was complicated. The court held that because the agents had probable cause to arrest Ruggiero when they found the syringe, her subsequent denial of ownership of the suitcase could be considered on the issue of abandonment. The court implicitly ruled, however, that the syringe did not give the agents probable cause to arrest Corbin. The court said that at some point after the search but before Corbin denied ownership of the suitcase, his detention ripened into an illegal arrest. Corbin's denial of ownership therefore could not establish abandonment. Nonetheless, the court admitted the tablets as evidence against Corbin, because the agents would have inevitably discovered the tablets through Ruggiero. Corbin does not challenge the "inevitable discovery" aspect of the district court's holding. It is therefore unnecessary for us to resolve the far from simple question regarding the legality of Corbin's detention.

prohibits travel in "interstate or foreign commerce . . . with intent to . . . (3) promote, manage, establish, or facilitate . . . any unlawful activity." Subsection (b) defines unlawful activity, in part, as "any business enterprise involving . . . narcotics." [15] Corbin and Ruggiero argue that to establish the existence of a business enterprise, the prosecution must prove that they engaged in a "continuous course of conduct." Corbin and Ruggiero argue that because their convictions were based entirely on the events surrounding their arrival at the airport on February 6, 1980, the prosecution has proved nothing more than an isolated incident, and not a business enterprise.

In this, the defendants are on sound ground. Although the Travel Act does not define "business enterprise," the term has consistently been construed to require "a continuous course of conduct." The language first appears in Attorney General Robert F. Kennedy's testimony before the Senate Judiciary Committee. Noting that the target of the Travel Act was organized crime, Kennedy said that "we are not trying to curtail the sporadic, casual involvement in these offenses, but rather a *continuous course of conduct* sufficient for it to be termed a business enterprise." *S.Rep.* No. 644, 87th Cong., 1st Sess. 3 (1961). The House Report stated that "the term 'business enterprise' requires that the activity be a *continuous course of conduct.* Thus individual or isolated violations would not come within the scope of the bill since they do not constitute a *continuous course of conduct* so as to be a business enterprise." H.Rep. No. 966, 87th Cong., 1st Sess. 3, *reprinted in* [1961] U.S.Cong. Code & Ad.News 2664, 2666. [Emphasis added].

Subsequently, several courts have defined business enterprise to require a continuous course of conduct. *See, e. g., United States v. Coran,* 589 F.2d 70, 72 (1st Cir. 1978); *United States v. Donaway,* 447 F.2d 940, 944 (9th Cir. 1971); *United States v. Cozzetti,* 441 F.2d 344, 348 (9th Cir. 1971); *United States v. Roselli,* 432 F.2d 879, 886 (9th Cir. 1970), *cert. denied,* 401 U.S. 924, 91 S.Ct. 883, 27 L.Ed.2d 828 (1971) (adding that a business enterprise involves a continuous course of conduct pursued for profit); *United States v. Zizzo,* 338 F.2d 577, 580 (7th Cir. 1964), *cert. denied,* 381 U.S. 915, 85 S.Ct. 1530, 14 L.Ed.2d 435 (1965). *See also United States v. Wander,* 601 F.2d 1251, 1257 (3d Cir. 1979) ("If the underlying offense involves gambling, liquor, narcotics, controlled substances, or prostitution, the Government must prove more than an isolated incident; it must prove a business enterprise.... [I]f the underlying offense involves extortion, bribery, or arson, then the business enterprise limitation does not apply.").

The only evidence the government offers to prove the existence of a business enterprise is the large number of quaalude tablets involved (4,700). Although the number of tablets alone may prove intent to distribute, *see United States v. Hutchinson,* 488 F.2d 484, 489 n.10 (8th Cir. 1973), *cert. denied,* 417 U.S. 915, 94 S.Ct. 2616, 41 L.Ed.2d 219 (1974), the number does not

---

**15.** 18 U.S.C. § 1952(a) and (b) state in full:

(a) Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to—

(1) distribute the proceeds of any unlawful activity; or

(2) commit any crime of violence to further any unlawful activity; or

(3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity,

and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2), and (3), shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

(b) As used in this section "unlawful activity" means (1) any business enterprise involving gambling, liquor on which the Federal excise tax has not been paid, narcotics, or prostitution offenses in violation of the laws of the State in which they are committed or of the United States, or (2) extortion, bribery, or arson in violation of the laws of the State in which committed or of the United States.

establish a continuous course of conduct. No evidence was introduced to prove that Corbin and Ruggiero had distributed drugs before or planned to distribute drugs in the future. No evidence was introduced to connect Corbin and Ruggiero with a larger, ongoing enterprise involving drug distribution.[16] No evidence was introduced concerning the source of the tablets, or the price Corbin and Ruggiero paid for them. Viewed in the light most favorable to the government, the evidence proves no more than that, on this one isolated occasion, Corbin and Ruggiero possessed 4,700 quaalude tablets and intended to sell them. The evidence is insufficient to establish the existence of a business enterprise. The conviction on the Travel Act count is reversed.[17]

AFFIRMED IN PART; REVERSED IN PART.

**16.** In this regard, we hold only that a continuous course of conduct is necessary to establish the existence of a business enterprise. We do not address the question whether a continuous course of conduct is necessary to convict a particular defendant under the Travel Act. We do not hold, for example, that if there had been evidence of a larger, ongoing enterprise here, the government still would have been required to prove that Corbin and Ruggiero engaged in a continuous course of conduct. The Travel Act makes it a crime to travel interstate with intent to promote, establish, or facilitate a business enterprise. If the existence of a business enterprise is proven, it may be that only one instance of interstate travel is necessary to convict a particular defendant. Although the Travel Act does not reach casual, sporadic involvement in criminal activity, see Rewis v. United States, 401 U.S. 808, 91 S.Ct. 1056, 28 L.Ed.2d 493 (1971), involvement in a business enterprise may be integral even though limited to one instance. We simply do not address the question. Cf. United States v. Cozzetti, 441 F.2d 344, 348 (9th Cir. 1971) (fact that operation may appear casual and sporadic because it was terminated after a short time does not remove operation from § 1952 where operation was intended to be profitable); United States v. Bergdoll, 412 F.Supp. 1308 (D.Del.1976) (limited, first-time involvement in massive operation to import and distribute marijuana cannot be characterized as casual).

**17.** Our holding makes it unnecessary to address the alternative argument that there was insufficient evidence to support a finding that Corbin and Ruggiero committed an overt act in furtherance of the unlawful activity subsequent to the interstate travel.