OPINION OF THE COURT
Fuchsberg, J.
In the main, we here determine whether, under the facts in this case, William Carrasquillo’s arrest following a street encounter with the police was made with probable cause, and, if it was not, whether physical evidence seized at the time of his arrest should have been suppressed as violative of the Fourth Amendment and the comparable section of our State Constitution (NY Const, art I, § 12; US Const, 4th. Amdt).
The defendant was acquitted of robbery in the first degree but convicted of robbery in the second degree (Penal Law, § 160.10, subd 1), for which, having served the minimum term of imprisonment, he is now on parole. Before his case was tried, a motion he made to suppress the articles in question was denied summarily without a hearing. When the case went to the Appellate Division, that court, therefore, remanded the matter to Trial Term to conduct an evidentiary hearing, pending the outcome of which the appeal was held in abeyance. At the conclusion of the hearing, the suppression court found no violation of defendant’s rights. The Appellate Division, Justice Sandler dissenting, thereupon affirmed the judgment of conviction, without opinion. The dissenting Justice, of the view that the facts “did not * * * measure up to the probable cause required for an arrest”, would have granted the motion to suppress and ordered a new trial (75 AD2d 784). For the reasons which follow, we agree with that conclusion.
The facts on which the stated issue must stand or fall are not seriously disputed. At 8 o’clock one clear Manhattan morning, a marked police patrol car, traveling northbound on Columbus Avenue, was approaching the intersection *251 of that street with West 81st Street. As it did so, its driver observed a pedestrian, who, opaque brown paper shopping bag in hand, also was approaching the intersection. The pedestrian, who turned out to be the defendant, was proceeding northerly along the west sidewalk of Columbus Avenue at a normal gait. The officer also noticed that the defendant’s clothes were untidy and that his hair was “frizzled up”. Further, as the car was about to enter the intersection, the officer testified that his eyes and those of the defendant met. Then, noticing that the latter made a “quick” left turn at the corner, the officer decided to back up and swing his vehicle into the intersection, where he stopped right off the southwest corner and within six feet of where the defendant was standing.
Alighting, the uniformed police officer and his partner went to the defendant and asked, “What do you have in the bag?” The response, given unhesitatingly so far as the record shows, was to name three items: a hair dryer, rosary beads and a radio. Asked the make of the radio, the defendant answered that it was a Sylvania, a popular electronics trade name. He then voluntarily proceeded to take the articles from the bag and hand them to the officers for their inspection. At that point, while the operator of the police car was handling the radio, noticing that it did not bear the name Sylvania, but that of Zenith, another well-known manufacturer of similar articles, he next asked the defendant “if [the articles] were his”. To further quote the officer, “ [Defendant] said he found them in a garbage a couple of blocks away”. Without more, the police thereupon placed the defendant and the contents of his shopping bag in the police car and took him to the police station. There he and the transported property were to be detained until a later search of precinct records unearthed a witness who would identify the articles; whereupon, he was formally booked for possession of stolen property.
On analysis, these events, logically and legally, are conveniently divisible into two parts. The first concerns itself with the period which preceded the inception of the police activity, i.e., the time when they undertook to approach the defendant. The second deals with their decision to arrest him.
*252 Focusing first on the earlier period, existing case law makes extended discussion unnecessary. For, it can hardly be doubted that there was no justifictaion for detaining the defendant when the police initiated the confrontation. To begin with, it is agreed that at this point the police conduct was not propelled by any knowledge that a crime had been committed or was about to take place, or, for that matter, that the defendant had been involved in such an episode. And, surely, whether the defendant was more or less attentive to costume or coiffure, particularly in this day of variegated dress, did not sanction restraint on his liberty or privacy. So too, that his eye was caught by the cruising police vehicle did not forfeit his freedom of movement. Nor, for the purpose of determining whether any detention could be so premised, can it be said that the turn he took at the corner, towards which he already was heading when the police drove up, provided an excuse to invade his personal security; given that almost any change in direction will call for sudden alteration in body movement, no more significance can be attached to the officer’s instantaneously perceived impression that defendant’s turn was “quick”, especially when at all other observed times he was seen to walk at a “normal” pace. These, neither singly nor in combination, constituted other than “innocuous behavior”, sole reliance on which would impermissibly reduce the foundation for any intrusion to nothing but “whim or caprice” (People v De Bout, 40 NY2d 210, 216-217; see, also, People v Howard, 50 NY2d 583, 590; People v Allende, 39 NY2d 474, 477). By no means do they reach the level of “reasonable suspicion”, which this court in De Bour indicated was essential to justify an encounter “involving actual or constructive restraint” (People v De Bour, 40 NY2d 210, 216, supra).
But, in this instance, at least at the outset, there does not appear to have been any “actual or constructive restraint”. No claim is made, for instance, that, in purportedly exercising their common-law right to inquire, the police acted in a threatening or abusive manner. Their questions were brief and to the point. They did not suggest to the defendant that he was compelled to answer their questions. Nor did they do or say anything to indicate that *253 he was not free to leave. No move was made to search or seize liis person or possessions. No frisk or any other action that would connote a prospect of resistance or violence or the avoidance of resistance or violence was as much as hinted. Moreover, while the defendant was asked what was contained in the bag, there was no demand that he open it or hand over its contents. Perhaps reflecting the commendably relaxed way in which this inquiry was carried on, the defendant, rather than evade or refuse to answer the questions, as was his right (People v Howard, 50 NY2d 583, 586, supra), elected to respond with alacrity and on his own proffered the contents of the bag for inspection.
Furthermore, though, as already indicated, the observations of the police were insufficient to permit them to act on “reasonable suspicion” and certainly not on “reasonable cause”, justification for simple inquiry, though meager, was not nonexistent. Comparison with De Bour, makes this self-evident. There, the defendant, by crossing from one side of a street to the other when, had he not done so, he would have encountered approaching policemen, was held to have supplied a sufficiently credible and objective predicate on which to found a bare informational inquiry (People v Be Bour, supra). Allowing for the fact that no two criminal cases are ever exactly alike, here police perception that defendant was paying unusual attention to the patrol car and that his turn into the side street was “quick”, even if these acts or the rapid succession in which they occurred, in fact were innocuous or coincidental or misunderstood, are equitable with the circumstances described in Be Bour. (See United States v Mendenhall, 446 US 544.)
However, though the defendant was not detained against his will while the street inquiry was in progress, as the People concede, from the moment the police directed him to their car for removal to the police station, he had been placed in custody and, concomitantly, the property in the bag had been seized. The question then becomes whether there was probable cause for this arrest. For, the cases are legion that, because the Fourth Amendment specifically guarantees that “no warrant shall issue, but upon probable *254 cause”, the requirement for searches and seizures made without a warrant “cannot be less stringent” (Wong Sun v United States, 371 US 471,479).
In passing on whether there was probable cause for an arrest, we consistently have made it plain that the basis for such a belief must not only be reasonable, but it must appear to be at least more probable than not that a crime has taken place and that the one arrested is its perpetrator, for conduct equally compatible with guilt or innocence will not suffice (People v De Bour, 40 NY2d 210, 216, supra; People v Corvado, 22 NY2d 308; La Fave, “Street Encounters” and the Constitution: Terry, Sibron, Peters, and Beyond, 67 Mich L Rev 40, 73-75). In making such a judgment, we must also bear in mind that “[i]n dealing with probable cause * * * we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act” (Brinegar v United States, 338 US 160, 175).
As our analysis has revealed, the events which preceded the officer’s approach to the defendant fall far short of any justification for an arrest of the defendant. Consequently, the application of the foregoing principles now requires us to concentrate on what was disclosed during the course of the ensuing inquiry. As the transcript tells us, except for one thing, this was a most uneventful encounter. The defendant did not attempt to flee; rather, he was most co-operative and most responsive. His story on the whole was quite straightforward and was told without prodding. The single suspicious note was sounded when, after the defendant had stated that the radio was a Sylvania, the officer happened to notice that it was a Zenith. But the sequence of questions, as described in the record, does not indicate the inquiring officer brought his discovery of the discrepancy to defendant’s immediate attention. Instead, astutely, he at once asked the defendant to whom all the articles belonged and received an immediate reply that they had been found by defendant in a nearby garbage heap. Looking at it pragmatically, the thus described manner and recency of acquisition of this discarded secondhand *255 item could, of course, have been a ready, a logical and a truthful explanation for why its new possessor thought of it in terms of one widely known manufacturer of small radios rather than another. All the more is this so since the explanatory information was produced in an answer seemingly unprompted by any question which might suggest that any doubt now lurked in the officer’s mind. It must also be remembered that at this time the officers had no knowledge that any of the three articles, none of which appeared to have any appreciable intrinsic value, figured in any crime. Furthermore, bearing in mind, then, that, in an otherwise unflawed accounting of his possession of the property, the singular imperfection was not without reasonable explanation, it seems to us impossible to say that the picture was one more consistent with guilt than with innocence.
This said, some words are in order on People v Moore (47 NY2d 911), where, in a memorandum decision on which the People place great reliance, we reversed an order of the Appellate Division which, inter alia, had granted defendant’s motion to suppress evidence seized incident to an arrest as a matter of law. Even for an issue which is so heavily dependent on the facts and circumstances in a particular case as is probable cause, the line of demarcation between Moore and the present case is sharp. True, in each, the defendant was arrested following a common-law police street inquiry concerning articles he was carrying. But in most other respects, the controlling details are dramatically different. In Moore, for instance, the defendant presented the unusual picture of one who, limping and bearing a serious wound over his temple, was first seen tramping along covered with snow and carrying a pillowcase, which looked like it contained a television set slung over his shoulder; in sharp contrast, Carrasquillo, as we know, presented the conventional picture of one who bore no signs of any fracas, was walking normally in broad daylight and was carrying nothing but an ordinary brown paper shopping bag in his hand. In Moore, when the police asked what the pillowcase contained, the defendant replied that it held a Sony television set and a fur coat, but when, upon a detective’s request, inspection was permitted, it was *256 found to contain three pieces of jewelry and watches as well; in Carrasquillo, however, the inspection volunteered by the defendant tallied with .the three articles he had described. In Moore, after misdescribing the name of the television set, the defendant could offer no explanation for doing so; though Carrasquillo, too, confused the radio names, implicit in his other answers was a plausible explanation for having done so. In Moore, the defendant was unable to explain where he had obtained the television set; here, the defendant suffered from no such inexplicable uncertainty. In sum, the balance struck between the rights of the defendant and that of the People was as different in the two cases as day is from night.
Finally, we treat with the People’s harmless error contention. The defendant, insisting that he had been misidentified, relied on an alibi defense. As the dissenting Justice below emphasized on this score, the People presented no more than an identification by a victim who never had seen the defendant before the robbery in which the latter allegedly participated. It is also noteworthy that, although the other alleged participant is one with whom the victim was acquainted and whom he presumably could easily identify, this person was never produced. Consequently, we adopt the view that the admission of the articles sought to be suppressed, especially since the error in failing to suppress them is of constitutional dimension, was not harmless (see People v Knapp, 52 NY2d 689, 698; People v Crimmins, 36 NY2d 230, 237).
For all these reasons, the order should be reversed, the motion to suppress granted and the case remitted to Supreme Court, New York County, for further proceedings on the indictment.