UNITED STATES of America

v.

George MELO, Defendant.

Crim. No. 88–258–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

Dec. 14, 1988.

John A. Martin, Asst. U.S. Atty., Janet S. Reincke, Sp. Asst. U.S. Atty., Alexandria, Va., for plaintiff.

R. Stanley Powell, Alexandria, Va., for defendant.

## MEMORANDUM OPINION

ELLIS, District Judge.

### Introduction

This is yet another in a long line of Washington National Airport (Airport) search and seizure cases.[1] This one has a slight wrinkle. Typically, Airport search and seizure cases turn on factual issues concerning whether the person was in fact in custody or consented to a search. Often suppression motions fail because the government carries its burden of showing that the person was not in custody, but was free to walk away or leave, and by showing that any search was consensual. Here, however, the government concedes, as it must, that there was no consensual search. It also appears that defendant was in custody relatively early on. In this case, therefore, the suppression motion turns on determining precisely when the arrest occurred, whether probable cause for the ar-

---

1. A LEXIS search discloses at least thirteen published Court of Appeals decisions on Airport search and seizure cases. That number, however, does not reflect the dozens of such cases handled in the Alexandria Division of the Eastern District of Virginia. Here, such cases are virtually weekly occurrences.

rest existed at the time and finally whether the search that disclosed the incriminating contraband was incident to a lawful arrest.

The matter is before the Court on defendant's motion to suppress the evidence of the substantial amount of illegal narcotics found on him as a result of the Airport search. Specifically, almost 500 grams of 88% pure cocaine hydrochloride were discovered on his person. An evidentiary hearing was held on the motion. Drug Enforcement Administration (DEA) special agents Johnston and Grimes testified for the government. Defendant testified on his own behalf. Counsel then argued the matter orally. On the basis of this record, the Court concludes that the motion must fail and, as required by Rule 12, Fed.R.Crim.P., sets forth here its findings and conclusions.

### Facts

The incident in issue occurred on October 17, 1988. On that date DEA agents Johnston and Grimes were on duty assigned to the substantial ongoing drug interdiction efforts at the Airport. Specifically, they were assigned to a special DEA task force ("Task Force"), created to stop the flow of illegal narcotics by mass transportation systems into the Washington metropolitan area.[2] Agent Johnston is a detective with the United States Park Police and has been assigned to the Task Force for the past twenty-two months. During this time, he has made approximately fifty drug-related arrests and has been involved in at least fifty more. Sergeant Grimes is a member of the Washington Metropolitan Airport Police Department. He was previously involved with the Task Force's investigations for three years and was reassigned to the Task Force two months ago. Over that period of time, Sergeant Grimes has been involved in 100 to 150 drug-related arrests.

On October 17, Agent Johnston and Sergeant Grimes were seated in the shuttle portion of the terminal monitoring flight arrivals from New York City, a well-documented source city for cocaine traffickers. It is established routine for DEA agents, including Johnston and Grimes, to monitor flight arrivals from known source cities such as New York and Miami. According to Agent Johnston, twenty-five to thirty, or approximately half, of the illegal narcotics arrests he has made involved individuals arriving on shuttle flights from New York.

At or about 2:30 p.m., Agent Johnston observed defendant enter the arrival area after deplaning from a Pan American Airways shuttle flight from New York City. Agent Johnston observed that defendant immediately began to look around furtively, thereby giving the appearance of nervousness.[3] Specifically, defendant moved his head quickly from side to side, with his eyes darting around the terminal area. Agent Johnston also observed what appeared to be a startled and shocked look on defendant's face when defendant, scanning the general area, suddenly made eye contact with Agent Johnston. Thereafter, Agent Johnston observed that defendant accelerated his walking pace and repeatedly turned to look back nervously at Agent Johnston. As defendant walked from the arrival gate to the elevator leading to the terminal exit, Agent Johnston noticed a large bulge in the front of defendant's trousers.[4] Specifically, the bulge was located in the area of defendant's lower abdominal area, between his waist and crotch. The bulge extended laterally across the entire front of defendant's trousers and

2. Known "source" cities include New York City, Miami, and Los Angeles. Arrest figures confirm that substantial amounts of illegal narcotics flow from these cities into the Washington metropolitan area through the Airport.

3. Agent Johnston testified that he was seated approximately fifteen feet from the path where passengers were exiting in a single file. There were no obstructions blocking his view.

4. Defendant has a slight build. This fact doubtless made the large bulge all the more noticeable and all the more difficult to conceal. Agent Johnston testified that defendant was wearing baggy trousers and a white, pull-over sports shirt. The front of his shirt reached just below his waistline. Defendant did not dispute this, but claimed that he was also wearing a dark leather jacket that covered his abdominal area. Agent Johnston did not remember defendant wearing any such jacket. The Court does not find defendant's claim credible.

protruded approximately two to three inches. It was, in Agent Johnston's view, a distinctively characteristic bulge, and he testified that he was convinced that the bulge was concealed illegal narcotics.[5] He reached this conclusion based on his substantial experience in drug enforcement and the substantial number of arrests he had made of individuals arriving on flights from source cities with bulges in their trousers.[6]

Defendant then used the escalator, descending to the main terminal. In so doing, however, defendant continued to glance nervously back over his shoulder at Agent Johnston. Agent Johnston and Sergeant Grimes followed defendant down the escalator and continued to observe him glancing back at them. The agents then followed defendant to the front exit of the terminal, during which time the defendant peered back over his shoulder two additional times. At this point defendant walked to a pay telephone. After hesitating briefly, however, he continued walking toward the terminal exit. Defendant then stopped next to a second bank of pay telephones. At this time the agents approached the defendant, identified themselves as DEA Task Force members and asked whether the defendant would talk with them. He responded, "Yes." Agent Johnston asked defendant if he had just arrived on a flight and defendant responded that he had. Agent Johnston then asked where he had boarded the flight and defendant answered "New York City." Agent Johnston asked defendant his reasons for coming to Washington and defendant answered by noting that his mother had a house in Gaithersburg, Maryland. During this period of conversation, Agent Johnston observed that the defendant appeared extremely nervous. In particular, the defendant's voice was high-pitched and cracking.

Agent Johnston asked for permission to see defendant's ticket, which defendant produced. Agent Johnston examined the ticket, returned it to defendant and asked for identification. Defendant extracted a wallet from his rear trouser pocket, opened it and displayed a New York driver's license. Agent Johnston asked defendant to remove the license from the wallet. Defendant did so. Again, Agent Johnston noticed that defendant seemed very nervous. Specifically, he noticed defendant's hands trembling as he removed the license from the wallet. Agent Johnston examined the license and noted that the name on the license matched the name on the airline ticket. He then returned the license to the defendant and explained the nature and purpose of the DEA Task Force. Following this, Agent Johnston asked defendant if he was carrying narcotics and defendant said "No." Agent Johnston then asked defendant for permission to search his person and defendant responded "No, I haven't done anything wrong." Agent Johnston pointed to the obvious bulge in the front of defendant's trousers, and asked directly "What is that?" Defendant's only response was "I haven't done anything wrong." Agent Johnston then told defendant that he would have to accompany the agents to the Airport Police Station so that they could obtain a search warrant. The defendant again stated, "I haven't done anything wrong." After arrival at the Airport Police Station, Agent Johnston contacted the United States Attorney's Office for the Eastern District of Virginia and advised a representative of that office of the facts and circumstances relating to defendant. He was told to go to the U.S. Attorney's Office to prepare an affidavit for a search warrant.

5. After testifying on direct examination that he "had no doubt" that defendant's bulge was drugs, Agent Johnston, on cross examination accepted defense counsel's characterization of this conclusion as speculative. The Court, too, asked questions on this point and is satisfied that the agent was quite convinced that the bulge was drugs. In admitting that his conclusion was speculative, the agent meant only that he could not be absolutely certain until he searched defendant and examined the cause of the bulge.

6. Specifically, of the approximately ten to fifteen arrests Agent Johnston has made in similar cases involving bulges, the bulges in all but two were located in the crotch or lower abdominal area.

During the course of this telephone conversation, defendant asked Sergeant Grimes if he could use the restroom. Sergeant Grimes said "of course" and escorted defendant to the restroom. Defendant attempted to enter one of the closed stalls. Sergeant Grimes prevented this and directed defendant to an open urinal. At this point defendant changed his mind and decided he did not need to use a urinal and stated that he only needed to wash his hands. Sergeant Grimes reported this incident immediately to Agent Johnston. After Agent Johnston completed his call to the U.S. Attorney's Office, he advised defendant that he was not under arrest but would have to be detained at the station until Agent Johnston returned from the U.S. Attorney's Office. Agent Johnston further advised defendant of his *Miranda* rights, which defendant acknowledged he understood. Agent Johnston then left the station to travel to the U.S. Attorney's Office. En route he was contacted by the DEA Task Force Group Supervisor (who had been called by the U.S. Attorney's Office) who advised Johnston that sufficient probable cause existed to arrest defendant and that he should be placed under arrest and searched. Agent Johnston returned to the station, advised the defendant that he was under arrest and conducted a search. From the front of defendant's trousers, Agent Johnston recovered a rectangular shaped package containing a white powdery substance.[7] This package was recovered from precisely the area where Agent Johnston had originally observed the large, noticeable bulge. The white substance in

the package tested positive for cocaine and, after being weighed, was found to be 498.-23 grams of 88% pure cocaine hydrochloride.

Defendant claims that when Agent Johnston and Sergeant Grimes stopped him in the Airport, they seized him in violation of his Fourth and Fifth Amendment rights. Specifically, because the agents had no reasonable, articulable suspicion that defendant was engaged in criminal activity, their seizure of him and subsequent search of his person were illegal. The products of that search and defendant's subsequent statements to the agents are the products of those illegal actions and should, therefore, be suppressed.

The government admits that when the agents stopped defendant in the Airport and told him to accompany them to the Airport police station, he was not free to leave. They assert, however, that his seizure was supported by sufficient probable cause. In the alternative, they assert that defendant's brief detention[8] in the Airport police station while Agent Johnston attempted to procure a search warrant was only an investigative detention based on a reasonable articulable suspicion. The bathroom incident witnessed by Sergeant Grimes strengthened the agents' suspicion and, at that point, gave them probable cause to arrest defendant without a warrant.

### Analysis

■ The threshold issue for the Court's determination is whether defendant was

---

**7.** Defendant did not contest that Exhibits 1 and 2 were photographs of the package of cocaine that he was carrying in his trousers on the day in question. These photographs reflect the package's dimensions as approximately nine inches long, five inches wide, and three inches thick. But contrary to the agents' testimony, defendant testified that the photographs do not accurately depict the package as he carried it. Specifically, he claimed that the bag was partially empty so that when he doubled it over and placed it in his trousers, its width was halved. The photographs contradict defendant's claim; the bag appears full. The Court, therefore, does not accept defendant's testimony in this regard. Moreover, if the bag depicted in the photographs were doubled over, the width might be halved, but the thickness would be nearly dou-

bled (to almost six inches) and the length unchanged. The resulting bulge would be huge. Even if the Court credited defendant's testimony on this point, the bulge created by a bag reduced as defendant suggested would still be too large not to create a bulge too noticeable to ignore.

**8.** Both agents testified that defendant was only detained for about twenty to twenty-five minutes before he was officially placed under arrest. Defendant, however, was not told that the detention would be brief. Sergeant Grimes, when asked by defendant, had told him that it might take Agent Johnston thirty minutes to two hours to obtain a search warrant, depending on the workload of the U.S. Attorney's Office.

seized by the agents and, if so, at what moment the seizure occurred. The Court finds that defendant was seized, for purposes of the Fourth Amendment, by the agents when he was told to accompany them to the police station. He was, in effect, under arrest at that time.

Whether or not a seizure has occurred depends on whether a reasonable person would have felt free to leave. *Florida v. Royer*, 460 U.S. 491, 497, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983); *United States v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). Clearly, the agents had the right to approach defendant, as they might any other citizen in a public place, and ask if he would answer a few questions. *Royer*, 460 U.S. at 498, 103 S.Ct. at 1324. At that point, defendant was free to refuse to talk with the agents. *Id.* at 499, 103 S.Ct. at 1325; *United States v. Lehmann*, 798 F.2d 692, 694 (4th Cir.1986). The fact that they identified themselves as law enforcement officers involved in a narcotics investigation and requested defendant's identification did not, at that time, convert the encounter into a seizure. *See id.* 460 U.S. at 497, 103 S.Ct. at 1324; *United States v. Mendenhall*, 446 U.S. at 555, 100 S.Ct. at 1877; *United States v. Notorianni*, 729 F.2d 520 (7th Cir.1984); *Gomez v. Turner*, 672 F.2d 134 (D.C.Cir. 1982).

The agents then told defendant that he would have to accompany them to the Airport police station. At that point, the Court finds, a reasonable person standing in defendant's shoes would not have felt free to leave. *See United States v. Lehmann*, 798 F.2d at 694. The agents apparently did not offer to the defendant the option of refusing to go to the police station. Rather, he was told to follow them. As they walked toward the station, Agent Johnston walked directly beside defendant, while Agent Grimes followed close behind. The agents even admitted in their testimony that, had defendant asked to leave, they would not have allowed it. Although the agents' subjective intent is not by itself determinative, their admission that they did not consider defendant free to leave further confirms the finding that a reasonable person would not have felt free to leave the scene.

■ The next step in the constitutional analysis is whether the government's seizure of defendant was reasonable.[9] Because the seizure at bar was, in effect, an arrest, the government bears the burden of demonstrating probable cause. Here, the government has met its burden. Probable cause is a common sense, nontechnical concept. *Illinois v. Gates*, 462 U.S. 213, 231–32, 103 S.Ct. 2317, 2328–29, 76 L.Ed.2d 527 (1983).[10] Its existence is ascertained by examining the totality of the circumstances facing the agents when they stopped defendant. *Id.* These circumstances, viewed through the eyes of experienced, well-trained agents,[11] need demonstrate " 'only

---

**9.** As the Fourth Circuit recently noted, "[t]he fourth amendment, of course, does not protect people from *every* governmental intrusion into their legitimate expectations of privacy, only from 'unreasonable' ones." *United States v. Whitehead*, 849 F.2d 849, 855 (4th Cir.1988) (citing *United States v. Place*, 462 U.S. 696, 706–707, 103 S.Ct. 2637, 2644–45, 77 L.Ed.2d 110 (1983)).

**10.** As the Supreme Court noted in *Gates*, "probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 233, 103 S.Ct. 2317, 2329, 76 L.Ed. 2d 527 (1983). More specifically, probable cause is be to ascertained from the totality of the circumstances, "viewed from the vantage point of a prudent, reasonable, cautious police officer on the scene at the time of the arrest

guided by his experience and training." *United States v. Davis*, 458 F.2d 819, 821 (D.C.Cir.1972).

**11.** In determining whether a reasonable suspicion or probable cause existed at the time of the seizure, courts should consider the training and experience of the officers involved. Precisely because of their background and experience, they may " 'perceive and articulate meaning in given conduct which would be wholly innocent to the untrained observer.' " *United States v. Gooding*, 695 F.2d 78, 82 (4th Cir.1982) [quoting *United States v. Mendenhall*, 446 U.S. 544, 563, 100 S.Ct. 1870, 1882, 64 L.Ed.2d 497 (1980), which cites *Brown v. Texas*, 443 U.S. 47, 52 n. 2, 99 S.Ct. 2637, 2641 n. 2, 61 L.Ed.2d 357 (1979) ]; *see United States v. Corbin*, 662 F.2d 1066, 1069 (4th Cir.1981). Here, Agents Johnston and Grimes had significant training and experience in similar drug-related investigations at the Airport.

the probability, and not a prima facie showing, of criminal activity.'" *Id.* at 236, 103 S.Ct. at 2331.[12] Probable cause thus lies somewhere between mere suspicion and beyond a reasonable doubt. *Brinegar v. United States,* 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879 (1949). In the case at bar, the government has clearly established the probability, at the time defendant was seized, that he was engaged in criminal activity.

*United States v. Lehmann,* 798 F.2d 692 (4th Cir.1986) is controlling in this case. The facts in *Lehmann,* while not identical, are strikingly similar to those at bar. There, as here, Lehmann was watched by two DEA agents as he deplaned from a flight from a known source city. *Id.* at 693. Agents observed Lehmann walking quickly from the deplaning area, looking around and glancing back in the Agents' direction a number of times. One of the agents also noticed a large bulge between Lehmann's belt and his crotch. Outside the terminal, one of the agents approached Lehmann and identified himself and the nature of his investigation. The agent then asked to see his identification and airline ticket. With Lehmann's consent, the agent then searched Lehmann's travel bag. During that search, the agent had the opportunity to observe more closely the "rounded corners" of a package in the area of the bulge. According to the agent, Lehmann tried several times to pull his jacket down, in an attempt to conceal the bulge. Like defendant here, Lehmann refused to allow the agent to search his person. The agent then asked Lehmann to accompany him to the police station. After his arrival at the station, Lehmann was arrested and searched. The search of Lehmann yielded a package similar in shape and size to that found in precisely the same area of this defendant's body. *Id.* at 693.

Based on these facts and the agent's experience with similar drug-related arrests,[13] the Fourth Circuit concluded that the district court had correctly found the requisite probable cause. The fact that Lehmann met the description of a typical "drug courier"[14]—that is, his arrival from a known source city and his nervous behavior after deplaning—combined with the presence of a large bulge in his crotch area, justified the finding of probable cause. More specifically, the particular size, shape, and location of the bulge "pro-

---

**12.** The government is correct in pointing out that probable cause is not necessarily a quantifiable, percentage standard. *See Illinois v. Gates,* 462 U.S. 213, 236, 103 S.Ct. 2317, 2331, 76 L.Ed. 2d 527 (1983) ("Finely tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence, useful in formal trials, have no place in the magistrate's decision [of probable cause.]"). The precise level of probability, however, is not clear. *See generally* W. LaFave, 1 *Search and Seizure* § 3.2(e) (2d ed.1987) (and cases cited therein) (discussing the degree of probability required to establish probable cause by various courts). Some courts require that the government show that it is "more likely than not" that defendant committed some crime in order to establish probable cause. *See, e.g., United States v. Welker,* 689 F.2d 167 (10th Cir.1982) (no probable cause to arrest where innocent explanation for removal of letter from mail box was as likely as criminal activity); *State v. Johnson,* 422 So.2d 1125 (La. 1982) (belief that defendant's activity involved criminal behavior must be more probable than not); *People v. Carrasquillo,* 54 N.Y.2d 248, 445 N.Y.S.2d 97, 429 N.E.2d 775 (1981) (when uncertain whether a crime has been committed, must appear to police officer that such criminal activity is more probable than not).

Others have adopted a less rigorous standard, requiring somewhat less probability. *See, e.g., United States v. Ginsberg,* 758 F.2d 823, 828 (2d Cir.1985) ("To establish probable cause, one need not make "a prima facie showing of criminal activity" nor demonstrate that it is more probable than not that a crime has been or is being committed."). Here, the Court need not determine which standard to apply. Even the more rigorous standard of "more likely than not" is amply satisfied here.

**13.** Specifically, the agent in *Lehmann* was aware that at least six persons had been recently arrested at the Airport as they deplaned from Eastern Airlines flights from Florida with packages of cocaine concealed in their crotch area. *Lehmann,* 798 F.2d at 694.

**14.** Law enforcement officers often rely on a "drug courier profile" to help them identify for further observation potential drug couriers. The profile is an informally-gathered, though not scientifically precise, collection of characteristics which are considered typical of persons carrying illegal drugs. *See Florida v. Royer,* 460 U.S. at 494 n. 2, 103 S.Ct. at 1322 n. 2.

vided a particularized ground for suspecting him of criminal conduct." *Id.* at 694.[15]

The instant facts are virtually indistinguishable from *Lehmann.* Here, defendant exhibited several characteristics of the typical drug courier profile. First, he arrived from a known source city, New York City. Next, as he exited the deplaning area, he glanced about nervously, particularly when he saw the agents seated nearby and later as they followed him through the terminal. In addition, the agents immediately noticed a large bulge in defendant's trousers of approximately the same size and shape in the same location as that found in *Lehmann.*[16] In the instant case, moreover, defendant was fairly thin and did not wear a jacket to cover his abdominal area, thereby making the bulge even more noticeable.[17] When the agents approached defendant and began asking questions, they observed marked signs of nervousness—including his noticeably trembling hands and a high-pitched, cracking voice. Based on their combined experi-

ence and training, they concluded that defendant was very likely carrying concealed narcotics and took him to the Airport police station. The agents, the Court finds, had probable cause to reach that conclusion.[18] The arrest of defendant, therefore, was constitutionally valid.

The government also contends, in the alternative, that defendant's detention until his formal arrest was merely an investigative detention based on a reasonable suspicion of criminal activity. *See United States v. Brignoni–Ponce,* 422 U.S. 873, 881–82, 95 S.Ct. 2574, 2580–81, 45 L.Ed.2d 607 (1975) (authorizing temporary seizure for questioning limited to the purpose of the stop). This claim is apparently without merit. The agents clearly had reasonable suspicion to stop defendant. Implicit in the Court's finding of probable cause is a sufficiently reasonable, articulable suspicion to justify that initial stop.[19] At that time, the agents sought to question defendant to confirm their strong suspicion that he was carrying concealed narcotics.[20] When they

---

**15.** Drug courier profile characteristics, standing alone, are not sufficient to establish probable cause. *United States v. Aguiar,* 825 F.2d 39, 41 (4th Cir.1987); *United States v. Gooding,* 695 F.2d 78, 83 (4th Cir.1982); *United States v. Harrison,* 667 F.2d 1158, 1161 (4th Cir.1982). *See Reid v. Georgia,* 448 U.S. 438, 440–41, 100 S.Ct. 2752, 2753–54, 65 L.Ed.2d 890 (1980). Thus, the fact that defendant appeared nervous while deplaning or even while talking with law enforcement officers is not independently persuasive. Such behavior is not uncommon in innocent persons. Rather, it is defendant's nervousness and other drug-profile factors, in combination with a distinct ground for suspicion that rise to the level of probable cause. Here, the large, pronounced bulge in the front of defendant's trousers provides the relevant distinct ground. *See United States v. Corbin,* 662 F.2d 1066, 1069 (4th Cir.1981) ("[A] suspicion of criminal activity ... must be based on 'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion.'") (quoting *Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968)).

**16.** Here, in fact, the defendant's bulge was apparently thicker than Lehmann's. In *Lehmann,* the bulge was an estimated two inches thick. Defendant's bulge here was approximately three inches thick. Very likely, therefore, it was even more apparent than the bulge in *Lehmann.*

**17.** The *Lehmann* court included in the combination of factors providing probable cause Leh-

mann's attempts to conceal the bulge with his jacket and his failure to offer any innocent explanation of these actions. The fact here that defendant did not attempt to conceal his bulge, however, does not require a different result.

**18.** *See United States v. Haye,* 825 F.2d 32, 35 (4th Cir.1987) ("When there are other indications of drug courier activity, the presence of such a suspicious bulge can provide a trained drug enforcement officer with probable cause to believe that the bulge is a package containing narcotics."); *United States v. Aguiar,* 825 F.2d 39, 41 (4th Cir.1987) (Probable cause to arrest existed when defendant had large bulge at ankle and exhibited other drug courier profile characteristics.).

**19.** *See Reid v. Georgia,* 448 U.S. 438, 441, 100 S.Ct. 2752, 2754, 65 L.Ed.2d 890 (1980) ("[A]ny curtailment of a person's liberty by the police must be supported at least by a reasonable and articulable suspicion that the person seized is engaged in criminal activity.").

**20.** *See Florida v. Royer,* 460 U.S. 491, 499–500, 103 S.Ct. 1319, 1325–26, 75 L.Ed.2d 229 (1983) (Temporary detention for questioning may be warranted on less than probable cause "where the public interest involved is the suppression of illegal transactions in drugs or of any other serious crime.").

escorted him to the police station, however, the nature of the detention changed. No longer were the agents seeking to investigate their suspicions of drug trafficking. Indeed, by their own admissions, they conducted no further investigation or questioning of defendant at the police station. Rather, they simply wanted to detain defendant until they could obtain a search warrant. For the search warrant, the agents would have been required to show and were apparently prepared to show probable cause to search defendant. The purposes of the detention, therefore, were not consistent with those of a temporary investigative detention.

Moreover, without probable cause the investigative methods employed must be "the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Florida v. Royer*, 460 U.S. 491, 501, 103 S.Ct. 1319, 1326, 75 L.Ed.2d 229 (1983). Even if the agents sought to continue their investigation, they failed to use the least intrusive means of investigation. Here, the use of trained dogs to detect the presence of narcotics on defendant's person would have been less intrusive than taking him to the police station and would have required only a brief detention. *See* id. at 506–07, 103 S.Ct. at 1329–30. If the dogs confirmed the presence of narcotics, the agents would have then had probable cause to arrest defendant. If not, defendant may have been released. The agents thus apparently stepped beyond the boundaries of an investigative detention.

In any event, the Court need not, for the disposition of the issues presented by defendant's motion, resolve the government's alternative *Terry*-stop claim. The Court finds that the warrantless arrest of defendant was amply supported by probable cause. Accordingly, defendant's motion to suppress is denied. The evidence obtained from the search of defendant's person and defendant's subsequent statements were the products of that valid arrest. Such evidence, therefore, is admissible.

Contrary to defendant's assertion, the Court's decision does not lower the standard of probable cause, nor does it put innocent citizens at risk of being subjected to constitutionally obnoxious searches. To be sure, a different result would likely obtain if defendant had been walking along a public street or in a shopping center, glancing around nervously, with a bulge in his pockets. Here, context is decisive. Defendant was not walking on a public street. He was not strolling through a shopping center. And this was no ambiguous bulge. Rather, its size and location strongly suggested illegal drugs, especially when the overall context is taken into account. Defendant was in a major gateway for drug trafficking after arriving by airplane from a known source city for illegal drugs. He acted nervously as he deplaned and walked through the terminal toward the exit. And, like a number of drug traffickers previously arrested at the Airport, he had a large bulge in his trousers across the length of his abdomen. This is a persuasive synergy of factors. Each factor, taken alone, might not rise to the level of probable cause. Taken together, however, they more than satisfy the constitutional probable cause requirement.

. An appropriate Order will be entered.