Fuchsberg, J.
(concurring). Increasing concern over unjustified police encounters with our citizenry, epitomized only last month by the argument of Kolender v Lawson (51 USLW 3377) in the United States Supreme Court (see 32 Crim L Rptr 4089), impels me, in this classic illustration of such a case, to articulate my own approach.
To this end, I first observe that, compatible with constitutional respect for each individual’s right to be free from arbitrary intrusion by government, a person may not be subjected to a “stop and frisk” in the absence of at least “reasonable suspicion” of involvement in criminal activity and a concomitant reasonable apprehension of armed resistance (People v De Bour, 40 NY2d 210, 223; People v Carrasquillo, 54 NY2d 248, 252-253; People v Chestnut, 51 NY2d 14, 21-22, cert den 449 US 1018). Thus, the present appeal requires us to decide whether these criteria were *56 met when New York City Police Officer John Morris, who had responded to a Harlem burglary-shooting, forced the defendant, James Carney, and a second man in whose company Carney then was, to raise their hands over their heads and submit to a “frisk”, or “patdown”, essentially because an unnamed individual, who claimed he saw the two men enter a neighborhood bar, thought they looked “suspicious”.
The frisk disclosed that Carney carried a revolver in the waistband of his trousers. Though neither he nor the revolver turned out to have any connection with the shooting, in which a shotgun rather than a revolver had been used, its discovery led to his indictment on a single count alleging unlawful possession.[1] He thereupon moved to suppress the gun on the ground that it was the product of an unreasonable search and seizure conducted in contravention of his constitutional rights (NY Const, art I, § 12; US Const, 4th, 14th Amdts). Upon denial of his motión, Carney elected to plead guilty to attempted felonious possession of a weapon (Penal Law, § 110.00 [Penal Law, former § 265.05, subd 2]), following which, as authorized by CPL 710.70 (subd 2), he was able to, and did, challenge the correctness of the suppression ruling by way of appeal from his judgment of conviction. The Appellate Division having now affirmed, without opinion (86 AD2d 987), the case is here pursuant to leave granted by a Judge of this court (CPL 460.20). For the reasons which follow, I believe the suppression motion should have been granted.
But, initially, as further background for my analysis, I recite whatever little more can be added concerning the circumstances of the police encounter with which we are concerned, necessarily relying for this purpose on the suppression Judge’s special findings as to what the testimony had been. By these we are informed that, by the time Officer Morris arrived at the scene of the burglary, its perpetrators had made their escape, officers other than Morris had taken command of the scene and the victim had been removed to a hospital. Apparently convinced that he was not needed, without more ado Officer Morris was *57 driving back to his station house when, some two blocks from the crime scene, he was stopped by. a man who, identifying himself only as a patron of an establishment known as Fat Man’s Bar, told him that “he had heard about the shooting” and that “two black men who looked ‘suspicious’ had just entered the bar”. On this and no more, Morris and other officers whom he invited to join him went to the bar with the informant, where the latter pointed out the defendant and his companion, each of whom was black. So far as the findings report, then and there and without as much as an inquiry, the two were ordered to raise their hands and subjected to the frisk. When Morris then brought the two men to the wounded man’s hospital bedside, the officer, as the findings tell us, learned from the victim that Carney and his friend “were not the men who had attempted to rob him”.
This as background, I next point out that, while “reasonable suspicion” may justify a forcible seizure short of a full-scale arrest, it must be based on “specific” facts so that its propriety may be measured by the “detached, neutral scrutiny of a judge” (Terry v Ohio, 392 US 1, 21). Standing alone, a mere “hunch” or “gut reaction”, since it will not fit this bill, will not serve to make a suspicion reasonable (People v Sobotker, 43 NY2d 559, 564). Nor is the “good faith” of an officer who so proceeds, no matter how sincerely, enough (see Beck v Ohio, 379 US 89, 97). For, recognition that intrusions short of a full-scale search or seizure in some circumstances may be countenanced on “reasonable suspicion” is not intended to obscure the reality that “a patdown for weapons” or, for that matter, any other purpose that involves exploration of the outer surfaces of a person’s clothing all over his or her body, “is a substantial intrusion into one’s privacy” (Ybarra v Illinois, 444 US 85, 108 [Rehnquist, J., dissenting], citing Terry v Ohio, supra, at p 17, n 13; see Priar & Martin, Searching & Disarming Criminals, 45 J Crim L, Criminology & Police Science 481).
Thus, it is clear that the Terry court was not insensitive to the qualitative, even if not quantitative, nature of the intrusion wrought by a stop-and-frisk when, eschewing a “rigid all-or-nothing model of justification”, it held that, in *58 “particular” circumstances, reasonable suspicion rather than probable cause could suffice to support such an event (392 US, at p 17).[2] It therefore has been “careful” to continue to confine the “narrow scope” of the Terry exception (Dunaway v New York, 442 US 200, 210), which, from the beginning, was cautiously conditioned on no less than the existence of justification by way of “articulable facts” and the “rational inferences” to be drawn therefrom (Terry v Ohio, supra, at p 21). This, of course, keeps a weather eye on what may be said to be the touchstone of the Fourth Amendment, its injunction against any search and seizure which is “unreasonable”.[3]
Needless to say, when a confrontation occurs, these concerns for the liberty and privacy of the individual are in tension with the far from inconsequential responsibilities assigned to law enforcement authorities. Stripped of rhetoric, in striking a balance, once we know, as here, the intensity of the intrusion, the focus must be on the reasonableness of the justification for undertaking it.
So examined, it is obvious that neither Officer Morris nor his fellows, when they forcibly imposed themselves on Carney, had any firsthand knowledge of any facts on which they could premise a reasonable suspicion that the defendant or his companion, any more than any other individuals, had committed, were committing or were about to commit a crime (see People v Cantor, 36 NY2d 106, 112; CPL 140.50, subds 1, 3). When, at the informant’s inspiration, their eyes lighted on Carney for the first time, there is nothing to indicate that they observed anything extraordinary or even noteworthy about him or his companion, not *59 in their manner, not in their dress, not in their movements, not in their speech, not, indeed, in anything from which the police could gather the slightest hint of any connection with the crime that was then on their minds. No one even suggests, for whatever it would be worth, that the two men were furtive, tried to conceal their presence, moved their hands, menacingly or otherwise, or avoided the police when the latter approached. Surely, the People’s attempt to gain some succor from the circumstance that Carney wore an overcoat on this New York January night must fail (cf. Ybarra v Illinois, supra, at p 93 [3/4-length lumber jacket worn in Illinois bar in March]).[4] No more remarkable, per se, was the presence of two men among the patrons of a bar on an evening. In short, from what the police observed, there was nothing, unless explained by the informant, to bear out his conclusory characterization of Carney as “suspicious”.
But the officers had neither sought nor received an explanation. This did not occur when the informant initially accosted Morris, or when other officers were being gathered to form the police party which was to enter the bar, or while they were traversing the one and one-half blocks between the place at which the informant stopped Morris and the bar itself. Yet, notwithstanding the absence of any objective fact or factual inference by which the intrusion could be justified, and without so much as the briefest kind of common-law inquiry (see People v Carrasquilla, 54 NY2d, at p 252; People v Howard, 50 NY2d 583, 586; People v De Bour, 40 NY2d, at p 219), the police precipitously proceeded head on to command Carney’s movements and to search his person.
Of course, the action a police officer may or, at times, must take need not depend on his or her own observations. Reasonable police suspicion of criminal activity can be founded, as it perhaps most often is, on information conveyed by a third party (see, generally, 3 La Fave, Search & *60 Seizure, p 98). So here, the People contend that Officer Morris was the recipient of such information when the anonymous informant not only told him that two suspicious looking black men had entered Fat Man’s Bar, but also repaired there with the police to identify them. While conceding that, by itself, ordinarily this “would not have been sufficient to provide the police with reasonable suspicion”, they go on to argue that the informant’s advice took on a different cast in light of the recent violent crime two black men who had not yet been apprehended were reported to have committed. But, especially in this heavily populated area, most of whose residents were black, the commonplace fact that two black men were patronizing a bar that was not far from the scene of the crime was simply not enough to forfeit their constitutional rights. (See Brown v Texas, 443 US 47, 52.)
True, Morris’ election not to ignore the informant’s lead, no matter its scantiness, is easy to understand. Had he acted instead with the requisite respect for constitutional rights dictated by the limited information to which he was privy, he might have deserved applause for conscientiousness. On analysis, however, on the totality of what was within his ken, there was only the remotest, if any, prospect that the individuals to whom his attention had been drawn had any more connection with the crime under investigation than would almost any other two men targeted at random in Harlem. Thus, having no reasonable basis to suspect Carney and his friend of the burglary, Morris could have had none for suspecting that Carney was armed.
Furthermore, the more one thinks of it the more apparent it becomes that the informant’s bare communication of his unsupported suspicion was inadequate to justify the frisk. He never conveyed anything to permit his surmise to rise above the level of a nebulous, baseless, inchoate opinion. Unlike such cases as People v McLaurin (43 NY2d 902) and People v Kinlock (43 NY2d 832), in each of which the informant specifically advised the police that the defendant possessed a firearm, a definitive indication of criminality, the informant in the case before us made the police aware of no fact linking Carney with any crime.
*61 For aught the officer knew, the subjective suspicion the informer ventured could have been the product of anything ranging from prejudice, paranoia or poor vision to a misanthropic view of mankind, an antipathy to strangers or the indulgence of a compulsive desire to engage in amateur sleuthing. Or, perhaps, it was an idiosyncratic reaction to a perfectly normal personality. After all, to one person an individual may appear “suspicious” for no better reason than that his attire is smart, while to another he may so appear because his dress is informal or unconventional; to one person such an opinion may be arrived at solely because the scrutinized individual is talkative, to another because of the target’s taciturnity. In short, speculations as to the cause of unexplained or inexplicable reactions to personality know no end. By no means can they satisfy the Terry standard.
Consequently, at best, all the informer proffered to prompt the police to proceed posthaste against the liberty and privacy of the defendant was a “hunch” or, as some might put it, an undefined “sixth sense”. Had a trained, experienced, objectively stanced police officer, let us say Officer Morris himself, been in Fat Man’s Bar when James Carney entered, he could not have executed a stop-and-frisk on such a subjective reaction alone. A fortiori, he could not rely on a similar reaction by a layman not possessed of police qualifications or responsibilities to justify the shortcutting of Carney’s constitutional rights. All things considered, then, there was no sufficient showing of reasonable suspicion to counterbalance appellant’s right of privacy.
I therefore conclude that the order of the Appellate Division should be reversed, the judgment and plea vacated, the motion to suppress granted and the indictment dismissed.
.Judges Jasen, Gabrielli, Jones, Wachtler and Meyer concur with Chief Judge Cooke; Judge Fuchsberg concurs in a separate opinion.
Order reversed, etc.

. Carney’s companion apparently was similarly uninvolved. Moreover, his frisk uncovered no weapon.

. Indeed, the Supreme Court, re-emphasizing the great store it places on the values the Fourth Amendment was intended to protect, took the occasion to note that it had “always recognized” that, “ ‘[n]o right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law.’ Union Pac.R. Co. v Botsford, 141 U.S. 250,251” (Terry v Ohio, supra, at p 9; see, also, Delaware v Prouse, 440 US 648, 653-654; People v Chestnut, 51 NY2d 14, at p 22, n 7).

. Section 12 of article I of the State Constitution, using language duplicative of that in the Federal Bill of Rights, affords separate and additional protection against “unreasonable searches and seizures” (see People v Elwell, 50 NY2d 231, 235).

. The official records of the National Climatic Center of the United States Department of Commerce indicate that, on the date of the frisk, official weather readings taken at Central Park in Manhattan, within a mile or two of Fat Man’s Bar, show that an inch and a half of snow had fallen and the evening temperature approximated 28 degrees Fahrenheit.