*197 OPINION OF THE COURT
Joseph C. Calabrese, J.
Respondent J.J., Jr. was convicted of rape in the first degree and sexual abuse in the first degree on October 16, 1981 and concurrent sentences of 10 to 20 years and 3V2 to 7 years were imposed on November 16, 1981.
Respondent’s 1981 convictions arose out of his being found guilty after a jury trial for the rape and sexual abuse of a 19-year-old female whom he had picked up and offered to drive to a train station. These crimes occurred while he was on parole for his conviction for the gang rape/sodomy of a 12 year old in 1975.*
Petitioner, State of New York, seeks to have this court determine that there is probable cause to believe that respondent is a sex offender requiring civil management, i.e., a sex offender suffering a mental abnormality, to wit, a congenital or acquired disease or disorder that affects his emotional, cognitive or volitional capacity in a manner that predisposes him to commit conduct constituting a sex offense and which results in respondent having serious difficulty in controlling such conduct.
A probable cause hearing was held and the court makes the following findings of fact and reaches the following conclusions of law.
Findings of Fact
Dr. Donald Greif, Ph.D., a licensed psychologist in the states of New York, Massachusetts and New Hampshire, testified as an expert in the evaluation of violent sexual offenders regarding his Mental Hygiene Law article 10 assessment of respondent on behalf of the New York State Office of Mental Health.
Dr. Greif met with respondent on May 16, 2007 and completed his report on May 22, 2007. Said report is based not only on his interview of respondent but also his review of documents regarding respondent.
In short, Dr. Greif stated the documents he reviewed tell J.J., Jr.’s life story, and included respondent’s parole board summaries (called inmate status reports) for his parole board appearances for the years 2004 and 2006; parole board release decisions that were made every two years from 1990 until 2004; a 1982 parole revocation decision regarding the 1975 rape case; a 1981 probation department report from Nassau County; the Of *198 fice of Mental Health Case Review (Division of Forensic Services) Team’s report containing respondent’s sexual offense history, criminal history, mental health treatment, disciplinary history; and parole release information documents.
Additional reviewed documents included those related to a mandatory sex offender program respondent attended at Oneida Correctional Facility and inmate misbehavior reports describing disciplinary infractions during respondent’s incarceration plus two actuarial instruments — the Static 99 and the MnSOST-R.
These documents, in addition to the interview, became the tools which aided Dr. Greif in forming his opinion as to whether respondent has a mental abnormality, whether he is predisposed to committing another sexual offense, and whether he is a danger to society.
Dr. Greif testified that one of the things which particularly struck him during his interview of respondent was that after 27 years of incarceration he denied having forcibly raped his victim, stating it was consensual sex and essentially blamed the victim for being angry at him because he did not want to sexually please her. He also stated she was accidentally cut by her own razor blade.
Dr. Greif assessed respondent as now being in denial after having admitted the rape and the events surrounding it in earlier prison-based sex offender therapy. He viewed this denial as extremely problematic, since treatment requires the offender to take responsibility. This denial is indicative of respondent’s lack of insight into himself, i.e., if one lacks recognition of a maladaptive destructive aspect of one’s self, that person is at considerable risk to reoffend and this became a significant factor in his ultimate conclusion that the respondent suffers from a mental abnormality which predisposes him to reoffending sexually.
Based upon the interview, Dr. Greif determined three diagnoses for respondent, to wit, sexual abuse of an adult, antisocial personality disorder, and borderline intellectual functioning.
The adult sexual abuse finding is compelled by his rape of both a 19-year-old victim and a 12-year-old victim. Victims in different age groups are a factor associated with a higher risk of recidivism. The fact of respondent’s reoffending while on parole indicates his even greater difficulty in controlling his impulses than would be the case if he were not on parole. Additionally, *199 the fact of the 12 year old being a gang rape victim led Dr. Greif to be concerned about respondent’s capacity to control his impulses, sexual impulses and aggressive impulses.
Dr. Greif additionally diagnosed respondent with paraphilia.
Respondent’s diagnosis of antisocial personality disorder refers to a pattern of behavior that includes his inability to empathize with other people’s feelings, his inability to express remorse, his deceit, manipulation and lying. In other words, it is indicative of respondent’s disregard for social norms and reflects a pattern of breaking societal rules or laws. Also included in this diagnosis were other earlier incidents of antisocial behavior, including truancy and larceny. An additional factor was that in respondent’s social history he indicated that he never lived with a lover for two years. This too is associated with an elevated risk of recidivism.
Dr. Greif s review of the records, including respondent’s summary of inmate status reports, revealed that after 2000 respondent declined to have any involvement in sex offender treatment after having participated at an earlier time. At Oneida Correctional Facility he made a full admission of the 1980 rape. Since completion of treatment is indicative of a reduced risk of recidivism, that failure to participate and complete treatment indicates the converse. As of March 6, 2007, respondent has not successfully completed a sex offender program and, as previously stated, has refused to participate in a program since 2000. Respondent’s institutional history establishes that for the first 20 years of his incarceration he received no sex offender treatment. He entered a program in 2000 and was terminated for poor attendance. All in all, respondent has received a total of eight months of actual treatment during three different time periods in his 27 years of incarceration.
Dr. Greif also used two actuarial instruments in his determination — the Static 99 and the MnSOST-R.
The Static 99 looks at 10 static factors, i.e., historical factual variables associated with the increased risk of recidivism. Each factor is scored either a “1” or a “0.” Respondent’s Static 99 score was 7 out of 10 which places respondent in the top category of “high risk to reoffend.”
One of the static factors for which respondent was scored was based on the fact that his victims were strangers. Dr. Greif testified that when the victim was unrelated or a stranger, statistical analysis of released sex offenders showed they reoff *200 ended at a higher rate than those whose victims were known to the sex offender.
The MnSOST-R is likewise an actuarial instrument and is used to predict the risk of adult male sex offender recidivism and looks at both historical (static) factors as well as institutional, i.e., dynamic risk factors. The test is comprised of multiple items, to wit,
“the static or the historical factors are [the] number of sex or sex-related convictions, length of sexual offending history, was the offender under any form of supervision when they [ ] offended, did the offense occur in a public place, was force or a threat of force used to achieve compliance in any sex offense, has any [ ] sex offense involve[d] multiple acts on a victim, [the] number of different age groups victimized across all sex offenses, whether the offender ever offended against a 13 to 15-year-old victim, [was] the offender [ ] more than five years older than the victim, was the victim a stranger in any offense, was there evidence of adolescent antisocial behavior, was this a person of substantial drug or alcohol use 12 months prior to the arrest for the instant offense, employment history and then the Constitutional or dynamic factors consisted of four involving one’s discipline history while incarcerated, chemical dependency treatments while incarcerated, sex offender treatment history while incarcerated and age of the offender at the time of release.”
Respondent scored an 18 on this test putting him in the highest risk group to reoffend.
Respondent’s history of marijuana/alcohol abuse are considered disinhibitors, i.e., often sex offenders offend while under the influence of drugs or alcohol. Accordingly, individuals with a history of substance abuse are more predisposed to reoffend insofar as the drug/alcohol has disinhibited him. Respondent’s 27-year institutional history, the incidents of disciplinary infractions and his refusal to submit to urine tests gives an appearance that a historically known substance abuser is continuing to be so.
Dr. Greif also determined that respondent’s lifestyle plans if he is released into the community are unrealistic — he would first live in a shelter, get some clothes from a thrift shop, try to work at a gym teaching body building, work with children at the gym, and attend sex offense treatment if he has to. Dr. Greif *201 found that respondent’s plans lack the specificity requisite to a relapse prevention plan.
Based upon the totality of his examination and evaluation of respondent and review of the records, Dr. Greif concluded that respondent suffers from a mental abnormality which affects his ability to control his sexual impulses and which predisposes him to the likelihood of committing a sexual offense and that in his current mental state respondent poses a danger to the community if he is released.
Conclusions of Law
Mental Hygiene Law § 10.06 (g) mandates a probable cause hearing to determine whether respondent is a sex offender requiring civil management, i.e., a detained sex offender who suffers a mental abnormality, to wit, a congenital or acquired condition, disease or disorder that affects the emotional, cognitive, or volitional capacity of a person in a manner that predisposes him or her to the commission of conduct constituting a sex offense and that results in that person having serious difficulty in controlling such conduct.
Interestingly, the Mental Hygiene Law neither defines probable cause nor the standard of proof necessary to establish probable cause at the hearing.
Respondent argues that the burden of proof should be clear and convincing evidence, whereas, petitioner argues the burden should be reasonable cause.
The court holds that probable cause to believe respondent is an individual requiring civil management is founded on reliable evidence which discloses facts or circumstances which are collectively of such weight and persuasiveness as to convince a person of ordinary intelligence, judgment and experience that there is reasonable cause to believe that respondent is a sex offender requiring civil management. (Matter of State of New York v O.V., 18 Mise 3d 917 [2008]; Matter of State of New York v K.A., 18 Mise 3d 1116[A], 2008 NY Slip Op 50103[U] [2008]; see Matter of J.T., 17 Mise 3d 1124[A], 2007 NY Slip Op 52133[U] [2007]; Matter of State of New York v Junco, 16 Mise 3d 327 [2007]; see also Perryman v Village of Saranac Lake, 41 AD3d 1080 [2007]; People v Bigelow, 66 NY2d 417 [1985]; Galland v Kossoff, 34 AD3d 306 [2006]; GPL 70.10 [2].)
The totality of the evidence, including exhibits, presented at the hearing is of such collective weight and persuasiveness that *202 leads the court to conclude that there is probable cause to find the respondent is a sex offender requiring civil management and a trial is ordered.
The next question is whether respondent should be confined pending the outcome of the trial.
In Mental Hygiene Legal Serv. v Spitzer (2007 WL 4115936, 2007 US Dist LEXIS 85163 [SD NY 2007]), plaintiff, Mental Hygiene Legal Service, challenged the constitutionality of certain provisions of the Sex Offender Management and Treatment Act (Mental Hygiene Law art 10) and sought to preliminarily enjoin enforcement of those provisions, including Mental Hygiene Law § 10.06 (k) which, upon a finding of probable cause, requires the court to commit the individual to a secure treatment facility during the pendency of the trial. The court held that plaintiff established a likelihood of establishing the unconstitutionality of Mental Hygiene Law § 10.06 (k), insofar as it mandated continued confinement of an individual through trial upon a finding of probable cause without a concomitant requirement that there be a finding that there is probable cause to believe the individual is dangerous and in need of continued confinement, and granted a preliminary injunction “insofar as the section requires detention pending trial absent a specific, individualized finding of probable cause to believe that a person is sufficiently dangerous to require confinement, and that lesser conditions of supervision will not suffice to protect the public during pendency of the proceedings.” (2007 WL 4115936 at *15, 2007 US Dist LEXIS 85163 at *54.)
When a conflict regarding the constitutionality of a state statute arises between a state court and a federal court, other than the United States Supreme Court, the state court is not bound by the federal court’s reading of the statute (28 NY Jur 2d, Courts and Judges § 229; Matter of Mason [State Commn. on Jud. Conduct], 100 NY2d 56 [2003]; People v Kin Kan, 78 NY2d 54 [1991]; see People v Handre, 94 MisC 2d 217 [1978]; People v Alston, 94 Mise 2d 89 [1978]; People v Williams, 9C Mise 2d 93 [1978]).
Statutory construction, the process for determining the meaning of statutes, is defined “as the drawing of conclusions with respect to subjects which lie beyond the direct expression of the text from elements known from, and given in, the text” (McKinney’s Cons Laws of NY, Book 1, Statutes § 71, Comment). Adi parts of a statute are to be construed as a whole (People v Mobil Oil Corp., 48 NY2d 192 [1979]; Golden v Koch, 49 NY2d *203 690 [1980]; Matter of Evans v Newman, 100 MisC 2d 207 [1979], affd 71 AD2d 240 [1979], affd 49 NY2d 904 [1980]) and all parts are read together to determine legislative intent (Gaden v Ga-den, 29 NY2d 80 [1971]; Matter of State of New York v Strong Oil Co., 105 MisC 2d 803 [1980], affd 87 AD2d 374 [1982]; Statutes § 97) and harmonized with each other as well as with the general intent of the whole statute {Matter of Honeoye Cent. School Dist. v Berle, 72 AD2d 25 [1979], affd 51 NY2d 970 [1980]; Statutes § 98).
Generally, the court should not find a statute unconstitutional unless such statute clearly violates the Constitution. It is a last resort and statutes should be construed to uphold their constitutionality (Statutes § 150; People v Harris, 64 MisC 2d 510 [1969]; People v Smith, 89 Mise 2d 789 [1977], cert denied 434 US 920 [1977]).
The Senate Memorandum in Support of the Sex Offender Management and Treatment Act defines its purpose as establishing “comprehensive reforms to enhance public safety by allowing the State to continue managing sex offenders upon the expiration of their criminal sentences, either by civilly confining the most dangerous recidivistic sex offenders, or by permitting strict and intensive parole supervision of offenders who pose a lesser risk of harm” (2007 McKinney’s Session Law News of NY, No. 2, at A-44 [May 2007]).
The Senate memorandum’s “Statement in Support” section notes that enactment
“is a balanced response to a compelling need. The compelling need is to protect residents of this state from sex criminals whose recidivism is predictable and uncontrollable. Most sex offenders are not in this category, and those individuals need not and should not be confined past the expiration of their criminal sentences. But there is a small group who, because of a mental abnormality, cannot control their sexually violent behavior even when subject to strict supervision. It is those dangerous repeat offenders whose confinement should continue beyond the expiration of their prison terms.
“The Act is a balanced response to this need because it mandates treatment and is designed to rely on protections other than civil confinement whenever possible, using this new process only as a last resort. The Act treats sex offenders in an individualized way based on their level of risk. The highest risk
*204 sex criminals are the ones who should be confined until they can develop the ability to control their own behavior. This Act will protect the public by creating fair procedures to identify those high-risk offenders and confine them for treatment” {id. at A-47).
Applying the rules of construction, the court finds that the Legislature intended that Mental Hygiene Law § 10.06 (k) implicitly require that upon the completion of the probable cause hearing the court must find both reasonable cause to believe respondent is a sex offender requiring civil management and probable cause to believe that respondent is dangerous to society or to himself or herself and there is no viable alternative to continued incarceration pending the outcome of the trial, i.e., lesser conditions of supervision will not suffice.
The testimony by Dr. Greif, as previously summarized, clearly establishes the necessity of continued confinement, to wit, that respondent is a person who if left unconfined is a danger to the community since there is a high probability of reoffense and that lesser conditions of released supervision will not suffice to protect the public during the pendency of the proceeding. Simply, respondent is a dangerous person not currently capable of reentering society and assimilating himself into the currently existing culture. Lesser conditions of supervision will not suffice at this time.
The final question is where respondent shall continue to be confined insofar as Mental Hygiene Law § 10.06 (k) requires that where the court finds probable cause to confine respondent upon a finding of dangerousness that he be placed in a secure facility designated by the Commissioner of Mental Hygiene.
The cases to date have shown that there are a minimal number of secure facilities under the control of the Office of Mental Hygiene and that housing respondents in those facilities is geographically unfeasible as it places them far from the place of trial and far from accessible contact with their attorney.
In this regard, Correction Law § 500-a (1) (f) provides that
“1. Each county jail shall be used: . . .
“(f) For the confinement of persons during any proceedings pursuant to article ten of the mental hygiene law.”
It is thus quite clear that the Legislature intended that individuals involved in civil management proceedings be housed as locally as is possible and that, as necessary, it encompasses *205 all proceedings both “pre” and “post” the probable cause hearing.
Respondent is placed in the custody of the Commissioner of Mental Hygiene and he shall be confined at the Nassau County Correctional Center during the pendency of the proceedings.

 Respondent was one of five individuals involved in the gang rape/sodomy.