OPINION OF THE COURT
Daniel P. Conviser, J.
Respondent is the subject of a sex offender civil management petition filed pursuant to article 10 of the Mental Hygiene Law. A hearing was conducted before me on September 22, 2008 to determine whether probable cause exists to believe EH. is a sex offender requiring civil management pursuant to Mental Hygiene Law § 10.06 (k). The petitioner called one witness, Dr. Erika Frances. Although the court did not credit certain aspects of her testimony, as explained infra, the court found her testimony to be credible. The respondent did not call any witnesses. For the reasons stated below, the court finds that there is probable cause to believe the respondent is a sex offender requiring civil management and also finds that the respondent should be confined rather than released to supervision pending trial.
Findings of Fact
Dr. Frances, a psychiatric examiner employed by the New York State Office of Mental Health since August 2007, testified that she is both a psychologist and psychiatrist currently evaluating and diagnosing sex offenders. Dr. Frances testified that she had previously worked in New York State at the Central New York Psychiatric Center treating and evaluating sex offenders and had also worked at the Albany Correctional Facility, as the Acting Coordinator of the Mental Health Unit, where she did sex offender evaluation and provided some crisis intervention treatment while supervising a staff of eight. Outside New York State, Dr. Frances testified, she had evaluated female offenders and juveniles in California as part of her doctoral program and did community mental health work in New Hampshire. She further stated that she had been to over 10 training sessions and conferences with experts in the field of sex offenders from March 2006 through August 2008.
Dr. Frances said she had evaluated or diagnosed sex offenders with disorders related to thought (i.e., schizophrenia), mood (i.e., depression, bipolar disorder), substance abuse (i.e., cocaine *691 dependence), sex (i.e., exhibitionism, paraphilia) and personality (i.e., antisocial personality disorder). She stated that she had evaluated over 40 sex offenders pursuant to article 10 and approximately 100 sex offenders in total. Additionally, Dr. Frances testified that she teaches developmental psychology at the Sage Graduate School and an undergraduate course in forensic behavioral science at the College of St. Rose.
With regard to article 10 matters Dr. Frances’ primary duty is to conduct psychiatric examinations and testify in court. Of the 40 article 10 sex offenders evaluated by Dr. Frances approximately 30, in her opinion, suffered from a “mental abnormality.” (See Mental Hygiene Law § 10.03 [i].) She stated that she had testified as an expert in psychology in both civil and criminal courts in New York State and that she had never been denied qualification as an expert in psychology. The court, without objection, qualified Dr. Frances as an expert in the field of psychology.
The respondent agreed to, and in fact did meet with Dr. Frances on June 16, 2008 at the Mid-State Correctional Facility for the purpose of being evaluated pursuant to article 10. In preparation for her interview Dr. Frances stated that she had read a report prepared by the clinical staff, mostly social workers, who constituted the case review team (CRT) in this matter.[1] In addition to the CRT report, and as part of accepted standard practice in her profession, Dr. Frances reviewed records, including a copy of the respondent’s rap sheet and a presentence investigation report from 1994, pertaining to P.H. prepared by the Department of Correctional Services, Division of Parole, and Department of Probation. Subsequent to her interview of EH., Dr. Frances prepared a written report of her evaluation on June 18, 2008. This written report was introduced into evidence by the petitioner.
In accordance with the Diagnostic and Statistical Manual of Mental Disorders, Fourth Revision, of the American Psychiatric Association (DSM-IV), PH. was given an Axis I diagnosis. Dr. Frances explained that Axis I diagnoses encompass “major mental disorders . . . like schizophrenia, depression, [and] *692 substance related disorders.”[2] The three Axis I diagnoses Dr. Frances deemed applicable to the respondent were exhibitionism, voyeurism, and cocaine dependence sustain full remission.
Dr. Frances testified that the diagnostic criteria for exhibitionism, as set forth in the DSM-IY are a minimum six-month period during which the patient experiences recurrent intense sexual arousal, fantasy, sexual urges or behavior that involve the individual exposing his genitalia to an unsuspecting stranger and the patient acts on the sexual urges or fantasies, or suffers marked distress or interpersonal difficulty. Dr. Frances went on to state that there were two types of exhibitionists. The first type feels guilty about their behavior and struggles to control it but is unable to. The second type of exhibitionist does not experience such humiliation and almost wants to be seen. EH. was identified by Dr. Frances as being the first type.
The diagnostic criteria for voyeurism, testified to by Dr. Frances, are a minimum six-month period of recurrent intense sexually arousing fantasies, sexual urges or behavior on the part of the patient involving the viewing of an unsuspecting person who is naked, in various stages of undress, or engaging in sexual activity, and that the patient acts on those urges or fantasies resulting in marked distress or interpersonal difficulty.
Finally, with regard to cocaine dependence sustain full remission, Dr. Frances stated that the diagnostic criteria involved the patient’s continued use of cocaine resulting in interpersonal difficulty. She stated that a patient given this diagnosis may express the desire to cease consuming the drug but is simply unable to control himself. The “sustain full remission” portion of the assessment means a patient has maintained a minimum period of sobriety of at least 12 months.
Dr. Frances described EH. as bright, articulate, cooperative, forthcoming, and likeable. While he was able to provide insight into most aspects of his life, he struggled to make sense of his exhibitionism and voyeurism. With respect to substance abuse, the respondent informed Dr. Frances that he started smoking marijuana in the ninth grade and subsequently started using pills and mushrooms. He stated that he started freebasing cocaine in 1981 and that between 1982 and 1993 he consistently used crack cocaine with brief intervals of sobriety. Dr. Frances stated that EH.’s record revealed that he has been sober since 1993. Dr. Frances stated that she did not believe that this diag *693 nosis was relevant in determining whether EH. has a mental abnormality and that substance abuse did not cause the respondent to commit the instant offense underlying the petition (a 1993 conviction for attempted rape in the first degree, sexual abuse in the first degree and burglary in the first degree). She did say, however, that she believed that there was a connection between EH.’s substance abuse and the offense underlying the instant article 10 petition in that crack use leaves people very uninhibited.
Recounting what EH. had told her about the instant offense, she said that EH. had been on a rooftop for several days watching his victim through a window while she was in her underwear and masturbated while watching her. He had fantasies about her and was under the influence of crack at the time.
Dr. Frances also noted that EH. had exhibited exhibitionist behavior prior to using crack, and that addressing the respondent’s substance abuse issues would not result in EH. ceasing to engage in exhibitionist or voyeuristic behavior. She testified that “with many exhibitionists they escalate to hands-on offenses. There’s no time limit as to when that will happen.”[3]
In discussing his sexual history with Dr. Frances, the respondent said he started having sex with college-aged women while he was in junior high school. He started to date in the ninth grade, but did not have a serious girlfriend until he was 21 years old. She was 17 years old when they started dating and they were together for four years. The respondent stated that it was his only meaningful relationship. During the time he was seeing his girlfriend EH. stated that he did have sexual relationships with other women. EH.’s last sexual contact was in 1993. Dr. Frances explained that his detachment from relationships with women helped to explain why he engaged in exhibitionism and voyeurism from a distance.
Dr. Frances testified that EH. is aware of the interpersonal difficulties he has encountered by virtue of not having pursued any meaningful relationships with women. He further informed Dr. Frances of his preference for masturbating over “putting any serious effort into a relationship.”[4] Dr. Frances then stated that she discussed with EH. each of his prior criminal convictions. The first offense they discussed was a 1979 public lewdness offense where the respondent said he was working as a *694 parking lot attendant across the street from a hospital. The respondent stated that he found it sexually arousing to look up the skirts and see the underwear of the nurses who would park their cars in the lot. EH. stated that he started to masturbate in the attendant’s booth. Eventually the respondent started to masturbate while helping nurses to their cars but hid his genitalia from them with his jacket. One of the nurses observed the respondent masturbating and he was subsequently arrested.
The respondent was dating the above-mentioned serious girlfriend during the time he was arrested in 1979. He further stated that his girlfriend went to visit him while he was incarcerated but that he felt too embarrassed to explain to her the circumstances surrounding his arrest. The respondent also informed Dr. Frances that he was so ashamed that he never saw his girlfriend again.
The respondent was arrested in 1980 when he was caught masturbating in a library in New Jersey. Though only arrested for the one incident the respondent stated that over a nine-month period he would go to various libraries and seek out unsuspecting women and masturbate at least two times per week. The respondent would then partially expose himself covering his genitalia with an item of clothing and proceed to masturbate while standing in one of the aisles. The respondent stated that he chose libraries because they afforded him the opportunity to be more discreet. Dr. Frances stated that this was relevant to her diagnosis of the more passive type of exhibitionism experienced by EH. in that it demonstrated his desire not to get caught. The respondent was again arrested in 1981 for the same conduct.
Dr. Frances testified that the rap sheet indicated EH. had been arrested on 27 occasions in total. The respondent stated that the offenses he committed between 1984 and 1985 were fueled by his need to finance his drug abuse. With respect to his arrest from June 30, 2003 the respondent told Dr. Frances that he became sexually aroused after having observed a woman near a department store in Manhattan who was wearing a skirt. The respondent covered himself with an article of clothing and was caught masturbating. At the time of that offense the respondent had only been released on parole for three weeks.
In November of 2004 the respondent was again released on parole. He informed Dr. Frances that upon being released he secured gainful employment while living in a shelter. He also stated that he was rebuilding his relationship with his family *695 and taking classes to address his anger management issues while receiving sex offender treatment mandated by the Division of Parole. However, on July 26, 2005 the respondent was again arrested in Manhattan for masturbating in public while observing a female he found to be attractive. Again, the respondent tried to obscure his actions with an article of clothing.
In addition to his sexual offense history, respondent has a long history of burglary, trespassing and theft-related arrests and convictions. According to criminal history information introduced into evidence as part of Dr. Frances’ report, EH. was arrested for burglary in 1984 with no reported disposition, convicted in 1985 of receiving stolen property, convicted in a separate 1985 incident of petit larceny, convicted of petit larceny in 1986 after being arrested for burglary, convicted in a second 1986 incident of criminal possession of stolen property after being arrested for burglary, convicted of criminal trespass in 1987, convicted of burglary in 1988, convicted in a second 1988 incident of criminal trespass after being arrested for attempted burglary, convicted in 1989 of shoplifting and convicted in a second 1989 incident of criminal trespass (in addition to public lewdness).
With respect to the offense underlying these proceedings, EH. told Dr. Frances that, while smoking crack cocaine on the street, he had figured out where the complainant resided and that he would look into her apartment from the rooftop of a nearby building and masturbate while observing her in her underwear. He stated that he engaged in this behavior over a period of several days. The respondent informed Dr. Frances that he entered the complainant’s apartment through a window and walked past her while she lay asleep in her bedroom. He stated that he went to the kitchen, picked up a knife, then returned to the bedroom and woke the complainant up by touching her arm. The respondent then brandished the knife and got on top of the complainant. He exposed his penis and placed the complainant’s hand on it. EH. did not get aroused and the complainant managed to toss him over the side of the bed. During the ensuing scuffle the complainant sustained a scratch while crawling away from the respondent. EH. stated that he then took the complainant’s purse and fled.
Dr. Frances testified that the fact that EH. did not get aroused after placing the complainant’s hand on his penis was relevant in two ways. First, it showed the difficulty EH. has in engaging in direct physical contact with women. Second, it showed that *696 EH. was humiliated and ashamed of his conduct. The purse was purportedly taken to support the respondent’s drug use. Dr. Frances stated that the information in the documents reviewed by her in connection with the instant offense was consistent with the information provided by EH. and that the instant offense was the only incident she was aware of where the respondent’s conduct escalated to the point where he engaged in physical contact with the victim.
With respect to the two times EH. was released on parole, Dr. Frances stated that three things stood out to her. The first was that he left the state to go to a recording studio without informing his parole officer. Dr. Frances stated that the significance of this was that it demonstrated that EH. did not understand the importance of his being able to be reached, if necessary, by the Division of Earole and that it showed a lack of recognition by EH. of his risk of re-offending. The two other relevant items were his arrests in 2003 and 2005. In 2003, EH. violated parole only three weeks after being released. Dr. Frances noted that the respondent had been in sex offender treatment for 4[1]/2 months prior to his release in 2003. Dr. Frances stated that it was significant that despite only having been released three weeks earlier, and knowing he was under supervision, that he re-offended; it demonstrated that “he can’t control himself.”[5] Similarly, in 2005 EH. had been in sex offender treatment for several months, under parole supervision, and working, yet he re-offended. Dr. Frances testified that “we know that from the exhibitionist in hands off sexual offending progress, escalates to hands-on offenses. And, we know that for EH. that’s already happened.”[6]
The respondent also discussed with Dr. Frances disciplinary infractions committed by him while incarcerated. Four of the five infractions involved EH. becoming aroused by, and masturbating to, female corrections staff while in his cell. Regarding the fifth infraction, the respondent said that the corrections staff felt he had been treated leniently with respect to a prior violation, so they fabricated a disciplinary infraction accusing EH. of having engaged in conduct similar to the conduct underlying the prior infractions. Again, the documentation related to the first four infractions corroborated EH.’s statements to Dr. Frances.
*697 Dr. Frances stated that she was able to verify through computer records maintained by the Department of Correctional Services that EH. was participating in sex offender treatment from February 2003 through June 2003. She also stated that she believed that EH. had not received sufficient sex offender treatment in that he attended 4x/2 months of what was to have been a six-month program. Since being confined in July of 2005 the respondent has not participated in any sex offender treatment.
Dr. Frances then described two types of instruments she reviewed in making an actuarial assessment estimating the likelihood of EH. committing future sex offenses. Specifically, she stated that she reviewed the results of the Static 99 and MnSOST-R tests performed by one Dr. Calistra. She described the Static 99, generally, as a 10 item tool that estimates the likelihood of a sex offender committing a new sex crime within a certain period of time. In the respondent’s case he received a score of seven. Dr. Frances stated that a score of seven renders the respondent a “high risk” relative to other sex offenders and means that the likelihood of EH. being convicted of a new sex offense is 39% within 5 years of being released and 45% within 10 years of release.
In reviewing the results from the MnSOST-R test, a 16 item actuarial tool that also estimates the likelihood of recidivism within a given period of time, Dr. Frances scored EH. a seven. While Dr. Calistra assigned EH. a score of nine, Dr. Frances explained that she discovered additional information after speaking to EH., information not known by Dr. Calistra at the time she made her assessment, which resulted in the lower score. Scoring EH. a seven means there is a 25% chance that he will recidivate within six years of being released. However, Dr. Frances stated that she did not rely on the MnSOST-R test because the test incorporates antisocial behavior and general criminality as relevant criteria. Since EH. was not diagnosed with antisocial personality disorder, and since Dr. Frances determined F.H.’s conduct to not be a function of general criminality, she opted to place greater significance on the Static 99 results.
In discussing his “offense cycle” with Dr. Frances, EH. stated he was aware that it was triggered by his viewing of attractive women. Dr. Frances stated that EH. becomes fixated on these women. He fantasizes about them and watches them for lengthy periods of time. He becomes aroused and masturbates to them as he observes them and then rationalizes his conduct. Dr. Fran *698 ces’ final assessment, within a reasonable degree of medical certainty, was that EH. suffers from a mental abnormality as defined in Mental Hygiene Law § 10.03 (i). She testified that the mental disorders of exhibitionism and voyeurism fall within the definition of a mental abnormality under article 10 of the Mental Hygiene Law.
Dr. Frances testified that EH.’s exhibitionism as it relates to the definition of mental abnormality is relevant in that he has a “volitional impairment.” Put simply, EH. is unable to control himself, upon viewing a woman he finds attractive, from exposing himself and masturbating. Dr. Frances also stated that exhibitionists typically recidivate more frequently than other types of sex offenders. She cited research which showed that only 17% of all exhibitionist behavior is reported, and between one third and two thirds of all sex offenses reported to law enforcement are related to exhibitionism. The same research showed a high frequency of exposing behavior by exhibitionists and that releasing an exhibitionist into the community affords greater access to the stimuli (i.e. women found to be attractive by the exhibitionist) that trigger sexual arousal. With regard to the impact on women victimized by exhibitionists, Dr. Frances stated that such victims alter their behavior by avoiding places where they observed the exhibitionist and that there exists a heightened level of fear that the perpetrator’s conduct will escalate to more violent behavior. Dr. Frances also pointed out that the victim pool is potentially enlarged by the chance that victims other than the targeted woman may observe the exhibitionism.
With regard to EH.’s voyeurism, Dr. Frances testified that he becomes so focused on observing women he finds attractive over periods of time that he lacks the volitional capacity to control himself such that his voyeurism escalates to exhibitionism. Dr. Frances stated that the respondent’s exhibitionism and voyeurism both predispose him to commit sex offenses. She also reiterated that P.H. currently poses a danger to the community in terms of committing future sex offenses and that releasing him at this juncture “would be setting him up for failure.”[7] Dr. Frances found it significant that EH. stated that his arousal was not as intense as in the past because it suggests that such arousal still exists.
Dr. Frances concluded, again, within a reasonable degree of certainty, that the only way to protect the community from EH. *699 re-offending during the pendency of these proceedings was to confine him to a secure treatment facility. When asked what types of sex offenses she believed EH. was likely to commit if released, Dr. Frances said he was predisposed to viewing women attractive to him and masturbating in public.
Dr. Frances indicated that her opinion with respect to respondent’s risk to commit additional sexual offenses was based in part on her review of research which indicated that exhibitionists had a high rate of recidivism and that “exhibitionist [síc] typically escalates to hands on offenses.”[8] She cited one specific article she had reviewed on this point although, in the court’s view, it was not clear whether that article was cited for the proposition that exhibitionists have a high rate of recidivism or typically escalate to hands-on offenses or was offered to support both of those conclusions. She also testified that exhibitionists typically were less likely to be caught than hands-on offenders and were, in public, constantly exposed to stimuli which could trigger their behavior.
On cross-examination Dr. Frances acknowledged that the “DSM,” which she acknowledged was “sort of the Bible of psychiatric diagnosis,” indicated with respect to exhibitionism that “[i]f the person acts on these urges [to expose himself to a stranger] there is generally no attempt of sexual activity with the stranger.”[9] She indicated that her view that exhibitionists escalate to hands-on offenses was “based upon the research book, the DSM-IV-TR.”[10] She testified that the escalation by the respondent of his exhibitionistic behavior to the hands-on instant offense “was a function of his exhibitionism. ”[11] Dr. Frances testified that “there’s a lot of research that demonstrates that exhibitionists escalate[ ] . . . Absolutely it’s likely he can escalate again. That’s a function of an exhibitionist. Typically they engage in other paraphilic behavior and many escalate.”[12] She further testified that although the respondent had exhibited feelings of humiliation and shame following the 1993 attempted rape offense, he experienced those same feelings following his exhibitionist behavior and that exhibitionist behavior had not been curtailed because of those feelings. She said that there was no indication that his sex offender treatment would prevent *700 EH. from escalating his exhibitionism and voyeurism to a hands-on offense.
With respect to the escalation of exhibitionism to a hands-on offense, Dr. Frances testified that the “dynamics behind it aren’t very clear.”[13] She described it as a “predatory kind of stalking type of thing.”[14] With respect to what conduct the respondent was predisposed to commit, she testified, “the predisposition is the exhibitionism and voyeurism. The escalation is related to the exhibitionism.”[15]
Conclusions of Law
Applicable Legal Standard
In this proceeding, as noted, supra, the court is called upon to determine whether there is probable cause to believe the respondent is a “sex offender requiring civil management.” The sex offender civil management determination contains two components. First, the respondent must be determined to be a “detained sex offender” (Mental Hygiene Law § 10.07 [d]). A detained sex offender, among other categories, includes any person who was previously convicted of a “sex offense” as defined by the statute and who is currently serving a sentence for that offense. (See Mental Hygiene Law § 10.03 [g] [1]; [p].) In this case, it is clear that EH. is a “detained sex offender” under the statute.
The probable cause determination, in addition, requires a finding of probable cause to believe that a respondent suffers from a “mental abnormality” (Mental Hygiene Law § 10.03 [i]). A “Mental abnormality” is defined as a “congenital or acquired condition, disease or disorder that affects the emotional, cognitive, or volitional capacity of a person in a manner that predisposes him or her to the commission of conduct constituting a sex offense and that results in that person having serious difficulty in controlling such conduct.” (Mental Hygiene Law § 10.03 [i].)
The Meaning of “Erobable Cause” under Article 10
The concept of “probable cause,” of course, is a time-honored one which appears in the Fourth Amendment and has been the subject of countless judicial determinations. It is clear to this court that in using the term “probable cause” the legislature *701 was adopting these time-tested formulations and was not seeking to establish a new probable cause standard for article 10 proceedings. At the same time, it is apparent that the type of determination which is made by a court in an article 10 proceeding varies significantly from the kind of on-the-spot determinations which police officers must make, for example, in determining whether there is probable cause to arrest a person for a crime. The concept of “probable cause” moreover is not amenable to a precise definition. It has been described as a “nebulous concept”[16] and its precise meaning under article 10 has engendered debate among petitioners and respondents in article 10 proceedings.
Respondents have generally argued, as they do in the instant case, that the standard of proof required at an article 10 probable cause hearing is that it must be “more probable than not” that the respondent is a sex offender requiring civil management. Respondents cite decisions of the New York Court of Appeals construing the term “probable cause” in criminal cases as using that standard. In People v Carrasquillo (54 NY2d 248, 254 [1981]), the Court described the applicable standard where courts review whether the police have probable cause to arrest as requiring that “it must appear to be at least more probable than not that a crime has taken place and that the one arrested is its perpetrator, for conduct equally compatible with guilt or innocence will not suffice.” Similarly in People v Mercado (68 NY2d 874, 877 [1986]) the Court, citing Carrasquillo, described the requirement that there be probable cause to arrest as requiring that it be “more probable than not” that criminal activity was taking place. Moreover, Carrasquillo and Mercado are not the only New York holdings which have used the “more probable than not” standard to define “probable cause” under New York law. The “more probable than not” standard has been cited repeatedly by New York appellate courts to explain the meaning of probable cause in cases in which the legality of an arrest is at issue. (See e.g. People v Fellows, 239 AD2d 181, 183 [1st Dept 1997], Iv denied 90 NY2d 893 [1997]; People v Radoncic, 239 AD2d 176, 179 [1st Dept 1997], lv denied 90 NY2d 897 [1997]; People v Alexander, 218 AD2d 284, 290 [1st Dept 1996], lv denied 88 NY2d 964 [1996]; People v Nicodemus, 247 AD2d 833, 836 [4th Dept 1998], lv denied 92 NY2d 858 [1998]; People v Elmore, 236 AD2d 851, 852 [4th Dept 1997], lv denied 89 *702 NY2d 1034 [1997]; People v Kea, 236 AD2d 858, 859 [4th Dept 1997], lv denied 89 NY2d 1037 [1997]; People v Schmitz, 289 AD2d 1022 [4th Dept 2001]; People v Youngblood, 294 AD2d 954 [4th Dept 2002].)
On the other hand, petitioners have consistently argued that the standard which should govern article 10 probable cause determinations should be “reasonable cause to believe” and that this is a different standard than the formulation “more probable than not.” Inherent in this debate is the notion that the standard “reasonable cause to believe” requires a lesser quantum of proof than would be required by the formulation “more probable than not.”
New York statutory law and federal and state precedents construing the term “probable cause” however, a term which has been interpreted by the courts primarily in criminal proceedings, have used both “more probable than not” and “reasonable cause to believe” as well as related formulations interchangeably when construing the term.[17] If there is an articulable difference in the quantum of proof required by these terms when used as aids to explicate the meaning of “probable cause,” this court has not been able to discern what it is. The New York Criminal Procedure Law uses the term “reasonable cause to believe” as the equivalent of the term “probable cause” in a variety of contexts. When the Court of Appeals in Carrasquillo and Mercado held that probable cause required a finding that it be “more probable than not” that an offender had committed a crime, however, they were also correctly explaining the meaning of probable cause.
Under CPL 140.10 (1) (a), a police officer may arrest a person for a crime when the officer has “reasonable cause to believe that such person has committed such offense in his presence.” CPL 70.10 (2) defines “Reasonable cause to believe that a person has committed an offense” to exist when “evidence or information which appears reliable discloses facts or circumstances which are collectively of such weight and persuasiveness as to convince a person of ordinary intelligence, judgment and experience that it is reasonably likely that such offense was committed and that such person committed it.” The term “reasonable cause to believe” is also used in the criminal law to articulate *703 the appropriate standard in search warrant and arrest warrant cases. (See CPL 690.10, 120.20.)
In Maryland v Pringle (540 US 366, 370-371 [2003]), the United States Supreme Court noted that the probable cause standard is
“a fluid concept — turning on the assessment of probabilities in particular factual contexts — not readily, or even usefully, reduced to a neat set of legal rules.
“The probable-cause standard is incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances” (internal quotations marks and citations omitted).
The Court also asserted that “[flinely tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence, useful in formal trials, have no place in the [probable-cause] decision.” (Id. [internal quotation marks omitted]; see generally Kamins, New York Search and Seizure § 1.02 [1] [a] [2008].) More recently, in People v Shulman (6 NY3d 1, 25 [2005]) the Court reiterated that probable cause to arrest required “information sufficient to support a reasonable belief that an offense has been . . . committed” (citation omitted).
Numerous courts have considered the question of whether the “more probable than not” or “reasonable cause to believe” standard should apply to probable cause determinations in article 10 cases. The cases have uniformly held that the “reasonable cause to believe” standard should govern and have, in some cases, implied or asserted that the two standards are materially different with the “more probable than not” standard requiring a higher quantum of proof than the “reasonable cause to believe” standard. (See Matter of State of New York v O.V., 18 Misc 3d 917 [Sup Ct, NY County 2008]; Matter of J.T., 17 Misc 3d 1124[A], 2007 NY Slip Op 52133[U] [Sup Ct, NY County 2007] [arguing that the New York Court of Appeals rejected the “more probable than not” standard in People v Shulman (supra) and that “reasonable cause to believe” is a different standard]; State of New York v J.J., 19 Misc 3d 196 [Sup Ct, Nassau County 2008] [reasonable cause rather than clear and convincing evidence is governing standard]; Matter of State of New York v K.A., 18 Misc 3d 1116[A], 2008 NY Slip Op 50103[U] [Sup Ct, NY County 2008] [reasonable cause to believe rather than more probable than not stan *704 dard applies]; State of New York v Pedraza, 18 Misc 3d 261 [Sup Ct, Suffolk County 2007] [reasonable cause to believe is a less stringent standard than either clear and convincing evidence or a preponderance of the evidence]; Matter of State of New York v Junco, 16 Misc 3d 327 [Sup Ct, Washington County 2007]; People v S.S., 17 Misc 3d 1128[A], 2007 NY Slip Op 52178[U], *5 [Sup Ct, Schuyler County 2007] [probable cause determination is a “prompt but not weighty judicial review at the threshold” and reasonable cause standard is less than a preponderance of the evidence]; People v Brooks, 19 Misc 3d 407, 409 [Sup Ct, Kings County 2008] [probable cause is “reasonable cause to believe” and “may or may not result in the determination that it is more probable than not that a respondent suffers from a mental abnormality”].)
The probable cause determination in an article 10 case, in the view of this court, can be properly analogized to some degree to a preliminary hearing upon a felony complaint under the Criminal Procedure Law. (See CPL 180.60, 180.70.) Indeed, the requirement in that statute that a preliminary hearing should normally be completed in one session is also contained in the article 10 probable cause hearing statute. (Compare CPL 180.60 [10]; Mental Hygiene Law § 10.06 [i].) In a preliminary hearing the relevant standard is “reasonable cause to believe the defendant committed a felony.” At the same time, in the view of this court, the fact that article 10 cases involve complex and difficult determinations about the mental status and potential future dangerousness of offenders and that the consequences of a civil management finding, in every case, are possible confinement for life make probable cause determinations findings of great import. The issues are at once more difficult and more significant than those which will tend to arise in the vast majority of criminal proceedings.
In the view of this court, the most cogent analysis of the probable cause issue in the article 10 context which has yet been made was articulated by Justice Dawson in Matter of State of New York v C.B. (19 Misc 3d 1103[A], 2008 NY Slip Op 50488[U] [Sup Ct, Bronx County 2008]). There, Justice Dawson explained:
“To be sure, the Court of Appeals used the ‘more probable than not’ language in both cases [Carrasquillo and Mercado, supra]; yet, far from articulating a new standard, the Court was explaining a fundamental principle that always has governed as *705 sessments of ‘reasonable cause.’ Simply put, ambiguous conduct that is as consistent with innocent behavior as it is with criminality does not give rise to a right to arrest someone whether one calls the appropriate test ‘reasonable cause’ or ‘probable cause’ . . . [T]he appropriate test in assessing the propriety of an arrest is whether the information put forth by an officer is sufficient to give rise to a reasonable belief that an offense has been committed by the person arrested.” (2008 NY Slip Op 50488[U], *5.)
In the view of this court, “more probable than not” and “reasonable cause to believe” are different ways of expressing the same time-tested yet amorphous probable cause formulation — a formulation which the legislature obviously intended to adopt in the article 10 statute.
Conclusions of Law
Turning to the question of whether there is probable cause to believe that EH. is a sex offender requiring civil management, at the outset the court believes it is important to clarify two legal issues which arose during the State’s presentation. The first is the definition of a “sex offense” under article 10. A “sex offense” under article 10 is defined as a specific list of crimes. (Mental Hygiene Law § 10.03 [p].) The definition includes a range of felony sex offenses as well as a list of nonsexual offense felonies which can qualify an offender for civil management if those crimes were “sexually motivated.” (See Mental Hygiene Law § 10.03 [f], [p], [s].) The list of sex offenses under the statute does not include any misdemeanors.
The definition of a “sex offense” under the statute is relevant to the issues raised in the instant matter in two respects. First, in order for a valid sex offender civil management petition to be filed, a respondent must have been convicted of committing a defined sex offense. (Mental Hygiene Law § 10.03 [g] [l].)[18] Here there is no dispute that the respondent was previously convicted of a qualifying sex offense, the crimes of attempted rape in the first degree and sexual abuse in the first degree.
The definition of a “sex offense” however is also applicable to the definition of the mental abnormality which an offender *706 must have in order to be found to be in need of civil management. As noted, supra, that definition requires that an offender have a “predisposition” to commit a “sex offense” and also have “serious difficulty in controlling such conduct.” (Mental Hygiene Law § 10.03 [i].) As is true with the “predisposition” prong of this definition, the “serious difficulty” prong, in referring to “controlling such conduct,” clearly also relates back to the earlier term in the sentence “sex offense.” Thus, in the court’s view, in order to be found to be in need of civil management, an offender must be found to have a predisposition to commit and serious difficulty in controlling his conduct with respect to committing a “sex offense” as defined under the statute. That “sex offense” definition, in turn, clearly refers only to a sex offense as defined under the statute because the term “sex offense” used in the mental abnormality definition is also, as noted, supra, a defined term under the law. Thus, the term “sex offense” in the definition of a mental abnormality under article 10 is not a generic or general term subject to varying interpretations — it is an explicitly defined term which relates to the specific offenses listed in the definition and no other offenses.
Exhibitionism, of the kind which formed the bulk of the State’s proof in this case, is the crime of “public lewdness” as defined in section 245.00 of the Penal Law. That crime, a class B misdemeanor, is not a “sex offense” under article 10. Thus, proof that a person had a predisposition to commit the crime of exhibitionism and serious difficulty in controlling his behavior with respect to exhibitionism would be clearly insufficient, on its face, to constitute a mental abnormality under article 10.
The closely related activity which the State presented evidence of with respect to respondent’s sexual activities was “voyeurism.” That conduct does not, in and of itself, constitute a crime. Voyeurism, of course, may be engaged in by an offender in conjunction with other behaviors which are criminal, like the crimes of stalking, public lewdness or “unlawful surveillance.”[19] *707 Like exhibitionism, however, “voyeurism,” standing alone, is not a “sex offense” under article 10.[20]
During argument following the hearing in this case, the State appeared to acknowledge this point. During the hearing’s evidentiary presentation, however, and in the earlier preparation of Dr. Frances’ report, it was unclear to the court that this critical distinction was recognized by the State or by Dr. Frances. In Dr. Frances’ “Evaluation Conclusions and Recommendations” section of her psychiatric evaluation of EH., for example, which was introduced into evidence at the hearing, she concluded, under article 10, that EH. had difficulty controlling his exhibitionistic and voyeuristic behavior. She made no mention, whatsoever, of any difficulty he might have in controlling any conduct which would constitute any “sex offense” under article 10. The main point made by Dr. Frances throughout her testimony was that EH. had demonstrated a marked inability to control his exhibitionistic and voyeuristic behaviors. Even when specifically asked about what it was, in her judgment, that EH. was predisposed to do, she testified that “the predisposition is the exhibitionism and voyeurism. The escalation is related to the exhibitionism.” The “escalation” behavior which EH. had engaged in when he committed the instant offense was generally treated as a side issue rather than the only issue of legal significance in determining probable cause in this case under article 10.[21]
*708 In other respects, at some points during her testimony, when Dr. Frances referred to “sex offenses” it was not clear, at least to this court, whether she was using the term genetically, discussing exhibitionism or discussing sex offenses as defined under article 10. In discussing the Static 99, for example, and indicating that EH. had scored a seven indicating that he was at high risk to commit a sex offense it was not clear to the court whether this meant that EH. was at high risk to commit additional acts of exhibitionism or that EH. was at a high risk to commit a sex offense as defined under article 10.
The second problematic issue in the petitioner’s presentation, in the court’s view, was the basis for Dr. Frances’ opinion that exhibitionists typically escalate to hands-on offenses, a conclusion she stated on a number of occasions. Her opinion was based, in part, on facts which were clearly in the record, including the way in which EH. had escalated in the instant offense from voyeurism and exhibitionism to burglary and attempted rape, the statements EH. had made to her about the pattern of his sexual offenses over the years and the uncontroverted evidence that EH. continues to have an inability to control his exhibitionistic and voyeuristic behaviors.
She also indicated, as noted, supra, however, that she had relied on “studies” which indicated that exhibitionists often escalated to “hands-on” offenses. As noted, supra, she cited two specifics. First, she mentioned an article by “Firestone, Et. Al.” but it was not clear to the court whether this article supported the conclusion that exhibitionists recidivate at a high rate with respect to further acts of exhibitionism or whether the article stood for the proposition that exhibitionists escalate to “hands-on” offenses. Other than noting the study’s author and its general conclusion she did not provide any information or opinion relevant to the study’s findings or its reliability. Second, Dr. Frances indicated her view that exhibitionists escalate to hands-on offenses was “based upon the research book, the DSM-IV-TR.” She did not elaborate further with respect to that research.
Historically, under New York law, an expert witness was entitled to base his or her expert opinion only upon facts personally known to the expert or contained in the evidence at a trial. That traditional approach was liberalized by the New York *709 Court of Appeals in the cases of People v Stone (35 NY2d 69 [1974]) and People v Sugden (35 NY2d 453 [1974]). In Sugden, the Court held that in addition to the traditional bases on which an expert’s opinion could rely, an opinion could be based on “material, albeit of out-of-court origin, if it is of a kind accepted in the profession as reliable in forming a professional opinion” or information coming from a witness subject to full cross-examination at trial. (35 NY2d at 460-461.) The first of these additional bases for expert opinion, which is the one relevant here, has come to be known as the “professional reliability exception.” In Hambsch v New York City Tr. Auth. (63 NY2d 723, 726 [1984]), the Court of Appeals explained that the professional reliability exception requires “evidence establishing the reliability of the out-of-court material.” (Id.)
Here, to the extent Dr. Frances’ opinion regarding the respondent’s propensity to escalate his exhibitionism and voyeurism to a hands-on or contact offense relied upon, as she indicated, unspecified “studies” that opinion was not reliable and in the view of this court cannot be credited. Dr. Frances’ description of these studies did not satisfy any of the requirements of the professional reliability exception. She did not identify, in any manner, how the studies were conducted or what their specific conclusions were. She did not indicate that any of these studies were considered reliable in any respect within her profession. She did not provide any information or any opinion which might indicate that any of these studies had, in fact, produced reliable results.
For the purposes of this motion, the court also does not credit the results of the Static 99 which Dr. Frances indicated showed that the respondent was at a high risk to reoffend. Even assuming the Static 99 results would qualify as a sound basis for an opinion under the professional reliability exception, it was not clear, as noted, supra, from the testimony what the Static 99 concluded the respondent was at a high risk to do — and whether that high risk related to the commission of a sex offense as defined under article 10.
The evidence in this case, however, and Dr. Frances’ opinion were based on much more than these problematic sources. When the bases for Dr. Frances’ opinion which were clearly problematic are put aside, in the court’s view, there is still probable cause to believe that EH. has a propensity to commit the kind of hands-on offense he committed in 1993 and has serious difficulty in controlling his behavior in committing such an offense.
*710 The court’s analysis begins with the respondent’s voyeurism and exhibitionism. That conduct is striking for its compulsive quality — the fact that EH., far more than having a “serious difficulty” in controlling his urge to masturbate in public seems, at least at this point in time, to be utterly incapable of controlling that conduct to any degree. Given his consistent history over decades of exposing himself and masturbating in public, despite numerous arrests, convictions, prison terms and sex offender treatment programs, it seems apparent that were EH. to be released to the public again, and stimulated again by the presence of women who would sexually arouse him, he would simply do what he has so consistently done throughout his adult life.
Second, that behavior has, as Dr. Frances testified, a predatory and stalking quality. As Dr. Frances testified, respondent “focuses” on his victims through voyeurism and that focus then seems to lead inexorably to public masturbation. That was most apparent in the instant offense but is also apparent in his other public lewdness convictions.
Third, as the instant offense demonstrated, the one instance in which his behavior is known to have escalated to a hands-on offense grew directly out of his exhibitionistic and voyeuristic behavior. That is, the hands-on offense did not arise in isolation from or from a different source than his voyeurism and exhibitionism. That offense arose directly from the same sexual fantasies and urges as his uncontrollable voyeurism and exhibitionism. When he escalated to a hands-on offense, moreover, he did so in an especially pernicious manner — the invasion of the sanctity of his victim’s home, the use of a deadly weapon and the implied threat, in the use of a knife, of death or serious injury were she not to comply with his sexual demands. It is also notable, in the court’s view, that the respondent has a long history of burglary and trespass arrests and convictions. His behavior in breaking into his victim’s apartment in the instant offense may have been more serious than his earlier trespass or burglary crimes. But, like his exhibitionism and voyeurism, respondent has a long history of entering locations or premises he is not entitled to be present in. In the court’s view, this history amplifies the risk that the respondent could engage in such criminal conduct to facilitate a sex offense again.
It is true that there is only one occasion on which the respondent is known to have escalated his exhibitionism and voyeurism to a contact offense. But under article 10, it is not neces *711 sary that an offender must have previously committed more than one qualifying sexual crime. In drafting article 10, the legislature could have easily decided to require that no person be subject to civil management unless there was proof that such a person had committed more than one sexual offense as defined by the statute. The legislature did not choose to impose such a requirement. The commission of a single qualifying sexual offense is not sufficient, under the statute, to find probable cause that an offender should be subject to civil management.[22] But here, there is much more than the commission of that single offense — there is the continuation of the specific precipitating behaviors from which that contact offense arose. Having no apparent ability to control his voyeurism and exhibitionism, the court is hard pressed to conclude that he is able to control the kind of hands-on contact offense which previously arose out of those identical behaviors.
It is true that at the time of the instant offense, the respondent was disinhibited by the use of cocaine and that his cocaine dependence is now, as Dr. Frances testified, in sustained full remission. But, as Dr. Frances credibly testified, the instant offense was not caused by cocaine disinhibition — it arose from his exhibitionism and voyeurism.
Respondent’s exhibitionism and voyeurism and his behavior during the instant offense are also strikingly connected, in the court’s view, in another important respect. Just as EH. feels shame and humiliation when he masturbates in public, he felt those same emotions, apparently, when he assaulted his victim during the instant offense at her home. The fact that he did not achieve an erection on that occasion and was ashamed of what he had done does not, in the court’s view, and as Dr. Frances testified, mean that he is not likely to repeat that conduct. The shame and humiliation he felt after the instant offense mirrors the shame and humiliation he feels when he masturbates in public. It is part of his offense cycle. For all of these reasons, the court believes that there is probable cause to believe that EH. is a sex offender in need of civil management.
Fursuant to Mental Hygiene Law § 10.06 (k), once a court finds probable cause to believe that a respondent is a sex offender requiring civil management, as this court has done here, *712 the respondent must be committed to a secure treatment facility. In Mental Hygiene Legal Serv. v Spitzer (2007 WL 4115936, 2007 US Dist LEXIS 85163 [SD NY, Nov. 16, 2007, Lynch, J.]), the court enjoined the operation of this provision of the statute because it held that the continued detention of a respondent in every case following a probable cause determination but prior to a trial was “inherently coercive” and a violation of constitutional due process. The court noted that under article 10, some offenders for whom probable cause was found could actually be released after trial to a regimen of strict and intensive supervision. However, before trial, the court noted, the statute provides that all offenders must be confined in all circumstances once a probable cause determination had been made. The court found that this formulation lacked a rational basis and held that such pretrial detention following a finding of probable cause should not be allowed “absent a specific, individualized finding of probable cause to believe that a person is sufficiently dangerous to require confinement, and that lesser conditions of supervision will not suffice to protect the public during the pendency of the proceedings.” (Mental Hygiene Legal Serv. v Spitzer, 2007 WL 4115936, *15, 2007 US Dist LEXIS 85163, *54.)
This court agrees with and adopts the holding of the Federal District Court in the Mental Hygiene Legal Serv. matter on this issue and therefore similarly holds that respondent here cannot be detained absent a finding that there is probable cause to believe he is dangerous and that lesser conditions of supervision will not suffice to protect the public during the pendency of this case. Here the court finds that such conditions have been met. The fact that the respondent has no apparent ability to control his voyeurism and exhibitionism and that such conduct has led in the past directly to a hands-on sexual offense indicates, in the view of this court, that the respondent is sufficiently dangerous to require confinement and that lesser conditions of supervision will not suffice to protect the public during the pendency of these proceedings. The court therefore orders that respondent should be confined in a secure facility pending trial.

. Under article 10, a “case review team” reviews the cases of sex offenders who may be candidates for civil management and recommends to the State Attorney General which offenders should be the subject of a sex offender civil management petition. (See Mental Hygiene Law § 10.05.)

. Hearing minutes at 24, lines 18-20.

. Hearing minutes at 32, lines 18-20.

. Id. at 34, lines 21-22.

. Id. at 47, lines 23-24.

. Id. at 48, lines 17-20.

. Id. at 62, line 8.

. Id. at 63, lines 7-8.

. Id. at 76-78.

. Id. at 79, lines 12-13.

. Id. at 86, lines 4-5.

. Id. at 88-89.

. Id. at 91, lines 16-17.

. Id. at 92, lines 19-20.

. Id. at 93, lines 10-12.

. See Kamins, New York Search and Seizure § 1.02 (1) (a) (2008 ed), quoting People v Dinkins, 76 AD2d 655 (1st Dept 1980).

. Justice Edward Lehner, in an article 10 proceeding in Matter of J.T. (17 Misc 3d 1124[A], 2007 NY Slip Op 52133[U], *4 [Sup Ct, NY County 2007]) surveyed the use of the term “probable cause” in “scores” of New York statutes and found a “paucity of decisional law interpreting these statutes.”

. A number of other categories of persons may also be subject to a sex offender civil management petition under the statute, for example, persons charged with sex offenses but found not guilty by reason of mental disease or defect. (See Mental Hygiene Law § 10.03 [g].) Those additional categories are not relevant to the instant motion and are not discussed here.

. “Unlawful surveillance” is a crime which generally occurs when a defendant surreptitiously views, records or broadcasts a victim who is dressing or undressing or whose sexual or intimate parts are exposed where the victim has a reasonable expectation of privacy. (See Penal Law art 250.)

. In articulating this point, and the related point made in footnote 21 (at 707), the court is not expressing a value judgment as to the seriousness of the crime of exhibitionism or the conduct engaged in by a person with the mental disorder of voyeurism. At the hearing Dr. Frances testified about the great harm which such conduct can cause to its victims and the court fully credits that testimony. The point being made here is purely one of statutory construction — the definition of a sex offense under article 10 does not include the crime of public lewdness or the disorder of voyeurism.

. During argument following Dr. Frances’ testimony, the State also made the argument that respondent’s repeated behavior in following his victims and masturbating was the “sexually motivated” crime of “stalking” and therefore a qualifying sex offense under article 10. “Stalking” under the statute, however, again, is not a generic term — it is only the specific crime of “stalking in the first degree” which may qualify as a sex offense under the statute if that crime is “sexually motivated.” The crime of stalking in the first degree requires either that a victim suffer physical injury or that a defendant’s behavior include the commission of a list of specific class A misdemeanor or felony sex crimes. (See Mental Hygiene Law § 10.03 [f]; Penal Law § 120.60.) “Stalking” a victim and engaging in public lewdness is not defined as a “sex offense” under article 10, even if the stalking behavior is “sexually motivated” unless the specific statutory requirements of Penal Law § 120.60 are met.
*708 Here, there was no evidence (other than the conduct which occurred in the instant offense) that the respondent ever engaged in conduct which would constitute the crime of stalking in the first degree.

. Indeed, the statute requires that article 10 juries be given an explicit instruction that they cannot find that a respondent’s commission of a sex offense alone is also sufficient to find the respondent has a mental abnormality. (Mental Hygiene Law § 10.07 [d].)